## Patrick's Heirs *vs* Chenault and others.

. APPEAL FROM THE FAYETTE CIRCUIT.

*Patents. Femes covert. Notice. Lapse of time. Fraud. Mistake.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

IN 1780, Richard Calloway, Sr. entered 400 acres of land, by virtue of a certificate of settlement, lying on the waters of Otter creek, near the present town of Richmond. In the same year he entered a pre-emption warrant of 1,000 acres, to lie on the south side of his settlement. Calloway having been killed by the Indians, surveys were executed on these entries in the bahalf of the heirs of Calloway, without naming them, in 1783. On the 7th of June, 1791, patents issued on these surveys "to John Patrick and Elizabeth his wife, the said Elizabeth heir at law to George Calloway, who was heir at law to Richard Colloway, deceased." John Patrick and wife took possession of the land under these patents prior to 1798. In 1797, Patrick and wife sold and conveyed 200 acres of the land to Richard Calloway, Jr. which was afterwards sold and parceled out to sub-purchasers. Afterwards, at different times, Patrick and wife sold and conveyed other parcels of the land, in all amounting to upwards of 300 acres, to others. Patrick

PATRICK'S H'RS. *vs* CHENAULT, &C.

jurisdiction of a bill in equity in a case commencing under the equitable jurisdiction of a Justice of the Peace —Qu.

6bm315
119   99
CHANCERY.

*Case 66.*

*April 10.*

The case stated.

PATRICK'S H'RS.
*vs*
CHENAULT, &c-

and wife joined in the deeds, and she attempted to part with her interest, but there are obvious defects in the certificates of acknowledgment, in several of the deeds. In 1819 Mrs. Patrick died, her husband surviving, who died in 1824. In December, 1842, the heirs of Elizabeth filed their bill against the holders of the parcels sold, charging fraud or mistake in the emanation of the grants to Patrick and wife, and notice in the purchasers and sub-purchasers of the equity of Mrs. Patrick and her heirs to the whole land.

Answers of defendants.

The defendants all answer, substantially denying every material allegation, and insisting upon being innocent purchasers for a valuable consideration, without notice, and on lapse of time and uninterrupted possession in themselves and those under whom they claim, for near fifty years, as a bar to the claim set up.

Decree of the Circuit Court.

The Circuit Court delivered a very interesting written opinion dismissing the bill. We entirely concur in the conclusion of that opinion, and with most of the reasoning, and direct its publication, appendant to the very few remarks which we deem necessary to make in addition.

A patent issued to husband and wife, who united in conveyances to purchasers, the husband survived the wife— Held that the title enured to him and vested in the purchasers and sub-purchasers, who had purchased for valuable consideration, without notice of any fraud upon the rights of the wife on the emanation of the patent.

The grants having issued to Patrick and wife jointly, the entire legal right devolved, upon him as the survivor, and inured to his vendees and sub-vendees, the defendants, and if they were purchasers or sub-purchasers for a valuable consideration, without notice of the complainant's equity or of the *mistake* or *fraud* charged, having law and equity upon their side, their legal title cannot be wrested from them, though no time had run in their favor. That they paid a valuable consideration, must be presumed from the receipt acknowledged on the face of their deeds, and the lapse of time that has run from their date, especially in the absence of a single countervailing fact.

There is no notice proven other than that which may be implied from the face of the patents. The patents being links in the chain of the defendant's derivation of legal title, it is presumed that they saw and inspected them, and if there be any thing on their face evidencing the mistake or fraud charged, or any thing which would

necessarily lead to enquiry on the subject, the defendants could not be regarded as purchasers without notice.

It is certainly to be greatly questioned whether there is enough found on the face of the patents, to notify the purchasers of fraud or mistake in their emanation, or to lead to enquiry as to the existence of either.

The patents are solemn record evidence of title, issued under the great seal of State, by high accredited officers of the government, the Register and Governor, and must be presumed to have been properly issued, in the absence of proof to the contrary. Indulging the purchaser in this presumption, the question arises, would he perceive any thing on the face of the patents to repel this presumption, or that would impel him to further enquiry on the subject?

The recital in the patent, that Elizabeth, one of the grantees, "was heir at law to George Calloway, who was heir at law to Richard Calloway, deceased," though it shows the origin of her title, does not indicate that John Patrick had not a joint right with her to the land, properly and legally derived, by contract or equitable arrangement extraneous the patents, which justified the grants to them jointly. It could scarcely be presumed or even suspected, that the grant could have been issued by those high functionaries without *some legal authority*, and the grants did not show that they had so issued. Nor was there any thing in the conduct of Mrs. Patrick that was calculated to arouse suspicions in the purchasers, that there was fraud or mistake in the emanation of the patents, but so far from it; she encouraged the purchasers and joined with her husband in selling, and no doubt lived upon and enjoyed, in conjunction with him, the proceeds of the sales. Instead of apprising the purchasers that there was an outstanding latent equity in her, which she or her heirs would assert, she concealed from them the existence of such claim, and not only permitted and encouraged the purchases, and the expenditure of the substance of the purchasers in making them, but also in the erection of valuable improvements upon the lands purchased. If any suspicion of mistake or fraud could have been aroused by an inspection of the grants, that

A patent issued to husband and wife, reciting upon its face, "the said Elizabeth being heir at law to George Calloway, who was heir at law to Richard Calloway, dec'd."—Held that there is nothing on the face of the patent to require farther investigation by a purchaser of the right of patentees, or indicate that the husband had not a joint right with the wife.

suspicion would have been immediately allayed by her acts. And had she been asked if any such outstanding equity or objection to the title existed, it cannot be doubted that she would have denied it. Her conduct, which speaks louder than words, did deny it. Shall she or those claiming under her, be permitted to recussitate and assert this *concealed equity*, which has been permitted to lie dormant for more than half a century, as *complainants* in a Court of *equity*, against those holding the legal title acquired through her instrumentality? It is insisted that she was a *feme covert* and could do no act which could divest her of her title. This is true as to the transmission of her legal right in a Court of law, but she was a moral agent, and we are not prepared to concede that she will, *as complainant*, in a Court of Equity, be allowed to take advantage of her own wrong to inflict injury on others.

Tho' a *feme covert* convey by an insufficient deed, yet if her heirs acquiesce for 22 years without evidence of their disability to sue, the purchaser will not be disturbed in his purchase.

It is said that she was an infant, and no ante-nuptial arrangement could have been made by her, by which the husband might have been entitled to a joint interest in the land. Her infancy does not appear on the face of the patents, nor is there any thing in them indicating to purchasers that any obstacle to such an arrangement existed. And if she was an infant, her infancy would not render her contracts void, but voidable only, and susceptible of confirmation after her arrival of age, by much less equivocal acts than those appearing against her and her heirs, and especially when those acts are to be used merely as a rebutter to her and their equity. If she as a *feme covert* could not confirm, her heirs after her death were not under such disability.

The case of *Brush* vs *Ware, and others*, (15 *Peters' Reps.* 104,) differs essentially from the case before us, and is much stronger against the purchaser. In that, he was apprized by the face of the warrant, that the right which pertained to the realty, and legally descended to the heirs of Hockady, was *assigned by his executor*. As an executor had no legal authority to deal with the realty or sell land, unless the authority was given to him by the will of his testator, a knowledge that the assignment was made by him, should have lead the purchaser to look into

the will, and looking into it he would have found, that so far from its giving him the power to make the assign-ment, it bequeathed his personalty only, leaving his realty undisposed of.   And in the case of *Reeder and others* vs *Barr and others*, (4 *Ohio Rep.* 458,) as it appeared on the face of the patent that it had issued to Newell, as *the assignee of the administrator of Henson Reeder, dec'd.*, it was adjudged sufficient to charge a subsequent purchaser with notice of the equitable rights of the heirs of Reeder.   And for the plain. reason that the purchaser, who must be presumed to have looked into the chain of title, must have seen, that the *assignment* was made by one who had *no legal or competent authority* to make it, or *power* to divest the heirs of their inheritance.

But in the case before us, the want of authority, or illegality in any assignment does not appear upon the face of the patents, by which a perchaser might be stimulated to make further inquiry.   And, if as an astute man, his fears might by possibility have been aroused, those fears would have been quieted by the conduct of Mrs. Patrick.

2d.  But waiving the question of notice, we are satisfied that the equity of the complainants, is barred by lapse of time.

Fraud or mistake in the emanation of the grants, is the wrong complained of.   If either occurred, they occurred at or before the date of the grant, which issued more than fifty years before the institution of this suit. And one of the purchases was made some forty five years, and others from twenty five to thirty years before the commencement of the suit.   The purchasers took possession, claiming the land specified in their deeds, adversely to all the world, as absolute owners in fee, and some of them have sold to others who have entered claiming and holding in like manner ; and all of them, or sub-purchasers from them, have continued to claim and hold in like manner down to this time.

There is no evidence of the fraud charged.   And the mistake, if mistake was made, occurred cotemporaneous-ly with the grants, and the wife had then a *right* of suit, and *might have* sued to correct the error and place her title upon its true ground ; and indeed it would seem to

PATRICK'S HEIRS
*vs*
CHENAULT, &c.

it is her duty to
do so. to guard
purchasers from
the consequen-
ces of the mis-
take, and after
her death his
tenancy by the
courtesy, pre-
sents no bar to
such a suit—AR-
GU.

have been her moral duty to sue and correct the error, as the means, not only of securing her right, but also of guarding purchasers from the injury which might be inflicted upon them. But instead of doing so, she not only submitted to the mistake, holding in conjunction with her husband under the grants as they had issued, but by her acts encouraged purchasers to buy and improve. If her disability of coverture might excuse her from sueing, and even from her wrongful conduct towards purchasers, she died in 1819, and her equity devolved upon her heirs, and more than twenty years have run since that time, before the institution of this suit.

If one disability could be added to another, the heirs were not *all* under disability at the time of the descent cast, and none can avail themselves of the saving in the statute, if the analogies of the statute are to be followed in this case, as has been frequently settled by this Court.

The fact relied on, that her husband was entitled to hold the land during his life, as tenant by the courtesy, is no excuse against a suit in chancery to correct the error in the grants, if one existed, and place the title on its true basis. The Chancellor possessed as full power to decree a conveyance to the heirs before the death of the father, as afterwards: The only difference in the decree would be, that in the former case the conveyance would have been directed to be made subject to the father's life estate in the premises. The cases to which we have been referred by the counsel, as authorities against this position, are altogether different from this. The most of them are cases in ejectment, where the right of entry and immediate right of possession, which is withheld, gives the right of action, and such right of possession cannot accrue during the continuance of the tenancy by the courtesy, and consequently no cause of action has accrued or right of action lies, and time will not commence running until the right of action accrues, as no suit could be brought before.

The case of *Hart's heirs* vs *Young*, (3 J. J. Marshall, 415–16,) and others of a similar character, to which we have been referred, are cases of adversary claims, in which time is not permitted to run against an equity held

under a junior patent, until the holder of the senior legal title entered upon the land covered by the two patents, though the elder patent has issued more than twenty years. The main reasons given are clear and applicable only to that class of cases, namely, that the holder of the equity under the junior patent, may not know that an elder grant has issued or that such claim exists; and if he knows of its emanation he may not know that any claim will ever be asserted under it, and in truth no claim may ever be set up, or any disturbance made to the enjoyment of the land by the holder of the superior equity, who may himself be in possession in the mean time.

In the case before us, both parties claim under the same derivation of title, and in looking into their equity the complainants must have perceived that the legal title was in others, and that the defendants were in possession, claiming absolute title, and holding adversely to them and to the whole world.

Their knowledge of these facts and a failure to sue for twenty three years after the death of their mother, when their *right* to sue certainly accrued, and eighteen years after the death of their father, when their right to the immediate enjoyment of the premises had accrued, and especially when more than half a century had run from the time the mistake was committed, if any was committed, must be deemed an abandonment of their equity, if they ever had any, and an implied confirmation of title in the purchasers, or such gross laches as precludes them from the aid of the Chancellor.

The decree of the Circuit Court is, therefore, affirmed.

The opinion of the Circuit Judge.

In June, 1791, two patents issued to John Patrick and Elizabeth his wife, one for four hundred acres, a settlement, and the other for 1,000 acres, a pre-emption, founded on claims of Richard Calloway, her grand father. In December, 1842, her heirs filed their bill in Chancery, against the defendants, to recover from them certain portions of the land which they held under deeds from Patrick and wife, or from their vendees, alledging that the patents were procured to be issued by fraud or mistake. In determining on her asserted equity, several questions

Vol. VI.          41

*Margin notes:*

PATRICK'S H'RS. *vs* CHENAULT, &c.

A title for 23 years, a right of possession for 18 years, and other circumstances, decided to be a bar by lapse of time.

Circuit Judge's opinion.

PATRICK'S H'RS.
*vs*
CHENAULT, &c.

are presented for consideration. The defendants hold under the vendees of the patentees. Several of the deeds from Patrick and wife weere evidently ineffectual to pass her legal title—others, according to the principle settled in the case of *Nantz* vs *Bailey*, (3 *Dana*, 116,) seem to have been properly acknowledged by her, and as to others, much doubt is entertained. By the acknowledgment on that to Richard Calloway, bearing date the 27th of December, 1797, she merely relinquishes her right of dower. Calloway having sold and conveyed the same tract of land to Thomas C. Howard, by deed, dated 5th of November, 1806, Howard and wife, and Patrick and wife, by deed of the 9th of August, 1810, conveyed 158¼ acres of said tract to Wm. Chenault. On that the certificate of the Clerk, after stating that John Patrick acknowledged it on the 11th of August, 1810, adds: "and on the 5th of October, in the same year, the said indenture was also acknowledged by Elizabeth Patrick, wife of said John, to be her act and deed, and having privately examined her *as the law directs*, she relinquished her dower to the within land, and the same has been duly recorded," &c.

In the case above referred to, (3 *Dana*, 116,) the Court says: "the act has not prescribed any form of certificate. It prescribes the duty of the examining officer, and is so far directory merely. But all that it requires to be certified, is that the wife was examined privily and apart from her husband, and thereupon declared that she voluntarily executed the deed." The certificate in this deed to Calloway, does not state that the wife was examined apart from her husband, but that she was privately examined *as the law directs*. The word *privately*, which signifies secretly, not openly, does not clearly exclude the presence of the husband. Three persons may be said to converse privately or secretly, and yet it would be difficult to determine upon the number of persons present necessary to make a conversation not private. The act requires that the examination shall be not merely privy, but apart from the husband. It would therefore be defective, unless the words "as the law directs," make it sufficient. The Clerk cannot be presum-

ed to be so ignorant of his duty, as to permit the presence of the husband, and then to certify that the examination was made as the law directs. What importance may be attached to those words, may be seen by reference to the case of *Hughes* vs *McKinzey*, (5 *Monroe*, 41.) If sufficient to bar the right of dower as decided in that, they must be equally operative as to the acknowledgment of the deed. In the case of *Nantz* vs *Bailey*, the portion of the opinion in 5 *Monroe* referred to, would seem not to have met the approbation of the Court, and whether the disapproving opinion which furnishes the most liberal construction given to the statute on the subject, may or may not, in some other opinion, be itself disapproved, is not certain. Regarding, however, each opinion as settling the law correctly on the points there discussed, they show an acknowledgment of Mrs. Patrick to be effectual for the purpose intended, unless the private examination should be regarded as applying exclusively to the *relinquishment* of dower. The certificate is awkwardly constructed, but there is nothing in it to show that the acknowledgment was *previous* to the examination, except that the notice of the acknowledgment precedes that of the examination; but that the acknowledgment was, therefore, first made or was made under the same and only examination, is not necessarily true. Suppose we transpose the words thus, "The said indenture was acknowledged by the said Elizabeth, to be her act and deed, and she relinquished her right of dower, I having privily examined her as the law directs," would not the examination apply as well to the acknowledgment as to the relinquishment?

The certificate shows the existence of three facts, the acknowledgment, the relinquishment, and the examination. Language is an imperfect vehicle of ideas, even when used by the learned. In endeavoring to ascertain its meaning, difficulties are often presented, and the truth is not more certainly attained by a *hypercritical* construction. Perspicuity is to be seen generally best preserved by speaking of events in the order of their occurrence, but if a certificate should state that a deed was acknowledged and signed, &c., we

should not conclude that it was acknowledged before sig-
nature, because the acknowledgment was first mentioned
in the cirtificate. The language of the statute is, "and
being privily examined," &c., could the certificate be in-
effectual as to the *feme* if it should transpose the words
and say, she declared, &c., being privily examined?
that is the form of the certificate under consideration, ex-
cept the addition as to the relinquishment of dower. It
may, therefore, apply to the latter act exclusively, but
not necessarily so. If that deed be valid as to Mrs. Pat-
rick, it closes the controversy as to the land embraced
by it. The deed from Patrick and wife to Curtis Field,
dated 7th of July, 1815, that from Howard and wife to
Field, dated 9th of October, 1820, and that from Patrick
and wife to Howard, dated 16th of May, 1816, according
to the doctrine settled by the aforesaid cases of *Nantz* vs
*Bailey* and *Hughes* vs *Mc'Kinzey*, passed the title of the
*feme covert.*

Without, however, making any positive determina-
tion as to the deeds, so far as they affect Mrs. Pat-
rick's heirs, let us enquire whether the evidence in the
case satisfactorily shows that the patents were procured
by fraud or mistake, as alledged in the bill of complain-
ants. It may be here remarked, that the appellate Court
has commented on such an alternative charge in a bill as
inadmissible, deciding that one or the other ground should
be positively assumed. The only light furnished on the
subject, is that which the entries, surveys, and patents
afford. If no circumstances occurred to justify a differ-
ent course, the patents ought to have been issued to Mrs.
Patrick alone. Why they issued as they did, cannot now
be ascertained with certainty. To sustain the imputation
of fraud, there is an entire destitution of evidence. The
complainants do not themselves, so insist, but only if
there was no fraud it was by mistake. If by mistake, by
whose fault did it occur? The answer is, by that of the
officers of government, of the Governor of Virginia and
of the Register of the Land Office, but that is a conjec-
tural conclusion by no means satisfactory. It was cer-
tainly unusual and a palpable violation of duty to issue
the patent to the husband and wife without authority, for

land to which *she alone was entitled*, and it is improbable
that they were so issued, without some authority at least,
supposed to be sufficient by those officers; a contrary in-
ference pre-supposes either great negligence or ignorance
on the part of the officers.  Besides, if there was fraud
or mistake, is it not strange that the fact should have re-
mained without objection and unnoticed, for more than
fifty years?  During all that time no one appears even to
have made a remark on the subject; no objection was
made, no discontent evinced by Mrs. Patrick or her fami-
ly.  The complainants do prove that John Patrick said
he held or claimed the land in right of his wife; that
cannot, however, release the difficulty.  Two witnesses
depose in relation to what he said.  They were not pre-
sent at the same conversation, and even in that point of
view it would be the weakest kind of evidence; but there
is still stronger objection to the proof.  Jones, the first
witness, proves the remark attributed to Patrick, to have
been made long after the date of the deed to Richard
Calloway.  What Kennedy heard was after 1812.  Good-
loe speaks of it as a report, and Miller says that Patrick
and wife settled on the land, claiming it in right of his
wife, between 1790 and 1798.  It might have been,
therefore, after 1797, and how he got his information he
does not say.  It is a matter, however, of little if any
consequence, whether he said so or not, since if he did
make such a declaration, he probably meant nothing more
than that the claim originated with his wife's grand father,
whose heir she claimed to be.

The issuing of the patent to Patrick as well as his
wife, may have been effected by means now incapable
of proof, which, if established, might exclude the
charge of either fraud or mistake.  The complainants
attempted to render the existance of such a state of
things the more improbable by charging that Mrs. Pat-
rick was, on her marriage, an infant; to establish
this, they rely on the deposition of Geo. White.  But it
is not sufficient.  He says it was the family repute that
Elizabeth Patrick was an infant when she was married.
He also deposes that he had examined the family bible
of his grand father, (who was said *John* Patrick,) and

there found the date of the birth and marriage of his grand mother, Elizabeth, (wife of said John,) entered in the hand writing of his grand father, which shows that she was married before she was twenty one years of age. To warrant the admission of declarations, not on oath even in relation to pedigree, it is essential that the names of the persons who made them should be stated, and that they be dead at the time of taking the proof, otherwise they do not furnish the best proof: (see 3 *Starkie*, 1101 *et seq. and page* 1119, *note* 1.) In relation to the family repute, it may be enquired, from whom did the witness get his information? At what time did he obtain it? We are not informed. It is not improbable that the complainants, (of whom his mother is one,) told him so, and that *post litem motam*. As to the entry in the Bible, it was but the declaration of John Patrick, and its admissibility must depend on the same general principles which regulate oral declarations on similar subjects; (see 3 *Starkie, page* 1115.) Entries made respecting the ages of his own children, might perhaps be admissible, yet even that has been questioned. In the case of the *lessee of Alberton* vs *Roberson*, (1 *Dallas*, 9,) evidence of hearsay from the father and mother, as to the age of one of their children, was rejected by the Court as legally inadmissible. In the case under consideration, the entry was made by the husband as to the day of his wife's birth. From whom did he get his information? The witness, moreover, does not furnish a copy of the entries, nor was it exhibited, although proven to be in the possession of the complainants. He gives merely his recollection of the entry and his computation of time. Nor does he tell us what opportunity he had of knowing his grand father's hand writing. He was probably a boy of not more than four or five years of age, if so old, when his grand father died. He says in his deposition, that he was then (1844,) over twenty one years of age, and his grand father died in 1824 or 1825. As to entries, there is no legal difference whether made in a Bible, in another book, or on any piece of paper; (see *Starkie*, 1113, 1114, *in note same*, 1115, *note* 2,) where it is said that entries copied from those made in a family Bible

by the father, transferred to another book by the father's directions, were inadmissible as evidence, without accounting for the non-production of the original.

If there be not now satisfactory evidence to show fraud or mistake, it follows from the proof in the cause, that the defendants were innocent purchasers without notice. Although the deeds may not be binding on Mrs. Patrick, they were undeniably so on her husband before her death ; he was the sole legal owner, and deeds made by him during the coverture, inured to the benefit of his vendees: It is not insisted that they had any information on the subject, or could, by ordinary diligence, have procured any on the subject, except what the entry, survey, and patents furnished. There is no proof that they inspected any of them ; the most that can be urged against them as to that is, that they might and ought to have examined them. Suppose they had done so, would they have necessarily perceived any equity in Mrs. Patrick. They certainly would not have been justified in concluding that the patents had been procured by fraud or mistake, and especially if on application to her she had assured them that they need not fear, that all was fair and correct. This presents again and more immediately, the propriety of enquiring into her conduct in relation to the matter. If in truth the patents were procured by fraud or mistake, did she not so act as to delude the purchasers, and if so, will a Court of Equity enforce the claim at the instance of her heirs? Shortly after the emanation of the patents, her husband and self began to sell and convey portions of the land, and at different times, from that until near the period of her death, they continued to make sales; she not only did that, but attempted at least, on more than one occasion, to confirm the conveyance to Calloway. Jones too, the witness of complainants, says that in 1812, he purchased 400 acres of the land, and that Mrs. Patrick urged him to make the purchase. That land is not in contest in this suit, but the fact is *referred* to for the purpose of showing the tenor of her conduct in relation to the sales generally; each purchaser took possession, and under the sanction of deeds which she in fact executed, and without the slightest intimation by her of

PATRICK'S H'RS.
*vs*
CHENAULT, &c.

any latent equity, were permitted to make improvements and enjoy the occupancy, and that state of things continued, not till her death only, but for about twenty three years longer, without objection or claim by the complainants. In the latter part of 1842, they, for the first time, complain of fraud or mistake, and they are ignorant which of the two was the truth of the case. If the patents had issued in her name, and the deeds were ineffectual to pass her title, her heirs might have succeeded in recovering possession of the land, and though it might even then, have been regarded as presenting a case of hardship on the purchasers, a Court of Equity would not have wrested from them their legal advantage; but when they assume the attitude of complainants, soliciting the aid of the Chancellor to divest others of their legal advantage, the case is presented under a different aspect. The Chancellor often refuses to decree a specific execution of a contract, on the application of one of the contracting parties, although he will not rescind it at the instance of the other. The governing principle in such case applies, by analogy, to this. A complainant, to merit the interposition of the Chancellor, must come into Court with clean hands. It must not appear that he has done any thing to mislead the defendant or to superinduce the difficulty. The complainants reply that their mother was a *feme covert*, and was not bound, except so far as she bound herself, according to the strict letter of the law. That will do at law, or while they are defendants, but as the matter now stands, shall Mrs. Patrick be considered to have been such a mere automaton that her conduct is to cut no figure in the case?

The ground assumed by the defendants, as to the statute of limitations, cannot be sustained. Had the legal title been in Mrs. Patrick alone, it is clear the lapse of time would not have barred the right of entry on the part of her heirs, because her husband, in such case, would have been tenant by the courtesy, and his vendee would have been entitled to the possession during his life; until that event the possession of his vendees would not have been adverse to the claim of the heirs, and this suit was instituted in less than twenty

years after his death. But the staleness of the demand is nevertheless worthy of consideration, and in connection with the matters previously adverted to, forbids a decree in favor of complainants; (see *Story's Equity Juris.* 2d *Vol.* 902, 903, *and* 904, *and notes.*) He was not tenant by the *courtesy;* the legal title was not in her alone, but in her and her husband, constituting an estate *sui generis,* by which, on her death, the fee. simple was vested in him alone. There was no insuperable obstacle to the prosecution of a suit to rectify the mistake or for relief against the imputed fraud, immediately after the date of the patents. It is admitted by the counsel of the complainants, that a suit for that purpose might have been maintained. It may be said that it is inconsistent with good policy and morality, to require the wife to sue her husband, and that her heirs should not be held responsible for her failure to do so. But the Chancellor, when he refuses relief on account of the staleness of the demand, or by adopting the statute of limitations, does not act on a principle of vindictiveness, but to guard against the danger of injustice by enforcing demands, where, from the lapse of time, the presumption is, that the true state of the case cannot be ascertained. The Legislature declares that certain actions shall be commenced in certain periods, or that the asserted right shall be barred. The Chancellor, by analogy, adopts the limitation for similar reasons, and it is but an extension of such reasoning, that induces him to reject a claim as stale. He has not established any specified time after the lapse of which the claim shall be considered as *stale;* each case must depend on its own *circumstances,* and when on such ground relief is refused, though it is the result of the *laches* of the complainant, it is not as a punishment. In this case no excuse for delaying the institution of the suit, after Mrs. Patrick's death, is offered, except that the Chancellor might have considered the husband as tenant by the *courtesy,* and might not have rendered a decree for immediate possession. That is not satisfactory. It is by no means clear that he would have been so considered in a Court of Equity, if as alledged in the bill, the patents had been procured by fraud, and especially if he

PATRICK'S H'RS.  had been an actor in that fraud.  Be that as it may, had
*vs*
WHITE'S  H'RS.  the claim been set up shortly after the date of the patents,
&c.  a doubtful equity at best, in 1819, bedimmed by the
lapse of almost thirty years, was becoming every day
more and more obscured by the increasing shadow of
time.  If in December, 1842, more than half a century
after it might have been instituted,  it was not stale, when
would it be so?  Viewing the case in every aspect in
which it can be properly considered, the complainants
are not, in my opinion, entitled to the relief sought.

Wherefore, it is decreed and ordered that their bill be
dismissed; and that the complainants pay to the defen-
dants their costs herein.

*Turner and Robinson & Johnson* for appellants:  *Ca-
perton* for appellees.