## Superior Oil Corporation et al. v. Alcorn et al.

(Decided January 17, 1930.)

(As Modified on Denial of Rehearing May 8, 1931.)

JOUETT & METCALF, HUGH RIDDELL and CLARENCE MIL-
LER for appellants.

E. E. RICE, L, T. WOLFORD and BRUCE & BULLITT for appel-
lees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

Harry Alcorn et al., hereinafter referred to as the
Alcorn heirs, were adjudged to be the owners of a tract
of land containing about 25 acres, referred to as the
Daniels tract, and the Superior Oil Corporation et al.
have appealed.

When the Alcorn heirs began this litigation they sought to recover this land and asked for an accounting for the oil removed therefrom, but, by a stipulation entered into by the parties, the matter of accounting was left in abeyance and only the question of title was adjudicated in the trial court, and that question only is before this court, on this appeal.

On October 28, 1878, Caroline Wheeler conveyed to Armilda Alcorn a tract of land illustrated by map No. 1,

MAP No. 1

In this deed Mrs. Wheeler gave this description of this land: "The following boundary of land in Estill county, Kentucky, on Cow Creek, binding on Jessie

Barnes, Gardner and Moore, James W. Muncie, W. J. Campbell, Leroy Alcorn, John S. Compbell and thence to the beginning supposed to contain 100 acres." One of the contentions made is that this description is too vague and indefinite, but reading this description and referring to the map will show the contrary.

The map is abundantly supported by the evidence. We have made this from the evidence for the purpose of illustration, it is given for that purpose only, and we do not mean to say any one is concluded by it or cannot in other litigation question its correctness or cannot show it is incorrect if, in fact, it is.

At or about the time of this purchase Armilda Alcorn and her husband, Leroy Alcorn, moved upon a tract of land referred to in this record as the Campbell rectangle, which had been acquired by Leroy Alcorn and John S. Campbell and partitioned between them. See the rectangle A, B, C, D, on map.

They did not at first know the full extent of this rectangle as a result of which they partitioned a portion of it in 1869 and the remainder in 1877. To illustrate these partitions, what Alcorn got in partition of 1869 is shaded by lines running north and south and what he got in partition of 1877 by lines running east and west, and the lines run the reverse of this on the parts Campbell got.

Leroy Alcorn built a house upon that portion he got in the division made in 1869, at the point marked (A) on the map, and there he and Armilda lived until she died, August 18, 1900.

After the acquisition by Armilda of this Caroline Wheeler land, this Daniels tract, other parts of this Wheeler land and what Leroy had got out of the Campbell rectangle were used and treated by Leroy and Armilda Alcorn as a single tract or farm.

The families of W. A. L. B. Sharp and Audley Campbell figure so prominently in this record that we have prepared a partial family tree showing the relationship of the various members of these families, the names of the plaintiffs being printed in black face type.

During the lifetime of Armilda she and Leroy sold a portion of this Wheeler land to their son, Joel Alcorn (see plat). After the death of Armilda, Leroy Alcorn sold another portion of this Wheeler land (see part

W. A. L. B. Sharp, often called Uncle Billy Sharp or Alphabet Sharp
- Mrs. Farthing......................Dudley Farthing
- Tilman Sharp, who sold his claim to Leroy Alcorn
- John Sharp
- Elizabeth Larison.......Edith Alcorn ⎤ married ⎫ Leroy Alcorn, Jr.

Audley Campbell, Sr. died intestate 1867
- Armilda Alcorn, wife of Leroy Alcorn died intestate on ........... August 18th, 1900.
  - Joel Alcorn
  - Robert Alcorn died intestate ........... May 12th, 1921
    - Gracie Alcorn
    - Harry Simp Alcorn
    - Albert Alcorn
  - Harry Alcorn
- John S. Campbell
- Audley Campbell
- Eliza Jane Blackwell, wife of Wm. Joe Blackwell
- William Joe Campbell ...............
  - Lou Horn, vendee of Leroy Alcorn
  - Joseph D. Campbell, vendee of Leroy

marked Millard Abney), another portion he sold to Armilda's niece, Lou Horn, and on November 23, 1900, he sold to Armilda's nephew, Joseph D. Campbell a tract of land largely taken from the Campbell rectangle, but a portion of which was a part of this Wheeler land, and another portion was land he had bought of John J. Alcorn.

MAP No. 2

We reproduce here, as map No. 2, a map in the record upon which the land conveyed by Leroy Alcorn to Joseph D. Compbell is shaded for illustration. That part of this land sold to Joseph D. Campbell which lies north of the line CD of the Campbell rectangle was a part of the Wheeler land. This portion is marked "Daniels tract," it is the land in controversy, and is the land of

which the Alcorn heirs were adjudged to be the owners. It is shaded by lines running east and west.

We ask the reader to patiently follow us as we plod through the labyrinth.

The appellants urge a number of grounds for reversal, which will be noticed in the course of this opinion, but the principal and controlling question is: What estate in the land in controversy did Leroy Alcorn have at the time, or take upon the death of his wife, Armilda Alcorn? If he had matured title in himself by adverse holding and possession, then his deed passed that title to Joseph D. Campbell. If he had a life estate by curtesy, then his conveyancee only passed that life estate. Section 2291 and section 2351 of the Kentucky Statutes are just as much a part of this deed as if they were written into it, and the effect of these statutes is to make of this deed a conveyance of just what Leroy Alcorn had. If all he had in this property was a life estate by curtesy, that is all that passed by this deed. The Superior Oil Corporation et al. realize this, and have diligently endeavored to show this Daniels tract had been acquired by Leroy Alcorn by adverse possession.

He and Armilda Alcorn were from March 12, 1859, until her death, husband and wife, living together in that relation. He was, by virtue of the statutes of this state then in effect, entitled to the use of her land with power to rent it out for not more than three years at a time and receive the rents. See Rev. St. 1852, p. 387, c. 47, art. 2, sec. 1; Gen. St. 1873, p. 518, c. 52, art. 2, sec. 1. Moreover the statutes of limitation do not run against a married woman see section 2506, Ky. Statutes. Besides, a husband who takes possession of his wife's land under his right as her husband takes and holds for her, his possession is not adverse, and can never ripen into title. See Meraman's Heirs v. Caldwell's Heirs. 8 B. Mon. 32, 46 Am. Dec. 537; Watt v. Watt, 39 S. W. 48, 19 Ky. Law Rep. 25; Berry v. Hall, 11 S. W. 474, 11 Ky. Law Rep. 30; 30 C. J., p. 580, N. 17, and Bowling v. Little, 182 Ky. 86, 206 S. W. 1.

Appellants contend that Leroy Alcorn took possession of the Daniels tract after he and John S. Campbell acquired and partitioned the Audley Campbell rectangle, and that his possession of it was but a continuation of the possession and inclosure maintained by Audley Campbell prior thereto; but the testimony relied

on to sustain this contention is wholly insufficient to show any claim or possession by Leroy Alcorn or Audley Campbell outside of or beyond the Campbell rectangle. The most that is shown is that, some two or three years prior to the execution of the deed from Caroline Wheeler to Armilda Alcorn, there was a fence along the northwestern line of the Daniels tract. See line 3—4. But there is no testimony that Audley Campbell built that fence, or that Audley Compbell claimed to it. On the contrary, it is shown that Audley Campbell never claimed beyond the line of the Campbell rectangle.

If it be conceded that Audley Camp'bell had reduced this Daniels tract to his possession at the time of his death in 1867, there is not a line of testimony as to when he did so, nor as to how long he had maintained it. There is no testimony that Leroy Alcorn, or any one prior to him, had before 1878 cleared, inclosed, or cultivated any part of the Daniels tract. Neither he nor any person under whom it is claimed he acquired possession had any color of title to it. The fence referred to did not inclose it, and there is no testimony showing, nor any claim made, that there was any marked and defined boundary around it. It is well settled that, before one can acquire an actual possession of land to which he has no title, he must enter thereon with the intention of holding it, and this intention is indicated by some act or fact, such as a clearing or inclosure, or by a well-marked and plainly defined line surrounding it. If he has no color of title, he must claim to a well-marked and plainly defined boundary, in which case he will be held to be in actual possession of so much as he actually reduced to his possession, and in possession by construction to the well-marked and plainly defined line. But, if he has no well-marked line surrounding his claim, then his possession is lmited to a clearing or inclosure. If he has neither clearing inclosure, nor a well-marked line, then he has no possession whatever. Slaven v. Dority, 142 Ky. 640, 134 S. W. 1166; Le Moyne v. Roundtree, 135 Ky. 40, 121 S. W. 960; Whitley County Land Co. v. Powers' Heirs, 146 Ky. 801, 144 S. W. 2.

It must be held, therefore, that, prior to the date of the deed from Caroline Wheeler to Armilda Alcorn, Leroy Alcorn had no possession of the land in controversy which the law recognizes. At that time, and thereafter, until her death in 1900, the possession followed the title and was in Armilda Alcorn, and it follows that, upon

her death, Leroy Alcorn took a life estate by the curtesy, under the provisions of Revised Statutes 1852, c. 47, art. 4, sec. 1; he and his wife having married March 12, 1859.

By this deed to Joseph D. Campbell, dated November 23, 1900, Leroy Alcorn conveyed only what he had, that is, a life estate, which did not cease until his death in 1919, when appellees first had the right to institute an action for the recovery of their inheritance. The rule is that limitation will not run against a remainderman during an outstanding life estate. It was so held in Salyer's Guardian v. Keeton, 214, Ky. 643, 283 S. W. 1015, 1017; Chenoweth v. Bullitt, 224 Ky. 698, 6 S. W. (2d) 1061. Fox v. Faulkner, 222 Ky. 584, 1 S. W. (2d) 1079. In this last-named case it is said:

"This court has uniformly written that one holding and owning an estate for life, though he be in possession under a deed which purports to grant the fee, is not holding adversely to the remaindermen, and that the statute of limitations does not begin to run against the remaindermen until the death of the life tenant."

It is shown that on January 13, 1905, Joseph D. Campbell, who took deed for the land in controversy from Leroy Alcorn on November 23, 1900, instituted suit in the Estill circuit court against appellees Joel and Harry Alcorn, and Robert Alcorn, father of the infant appellees, wherein he sought to quiet his title to this Daniels tract of land and to recover damages for slander of his title. The defendants therein, on the day after they were served with process, filed a motion to require the plaintiff to elect which of the causes of action he would prosecute. The record does not show that anything further in the case was done, except that the petition bears an indorsement reading: "Off, April, 1905." It is insisted by appellant that this action was positive notice to appellees that Campbell was claiming an absolute title to the property adversely to them, and required of them that before the expiration of 15 years thereafter they institute an action against Campbell or his vendees for the purpose of having their title settled, as was done in Boggess v. Crail, 224 Ky. 97, 5 S. W. (2d) 906, 909, and in Simmons v. McKay, 5 Bush 25, and Keller v. Stanley, 86 Ky. 240, 5 S. W. 477, 9 Ky. Law Rep. 388, referred to in the Boggess case; otherwise limitation

would run against them, and they would be estopped to assert any claim to the land.

In Boggess v. Crail, 224 Ky. 97, 5 S.W. (2d) 906, 909, the court, in approving the practice of permitting the remaindermen to maintain such an action, said: "The reasoning underlying the practice thus permitted is that the remainderman may be placed in condition to make the estate available to him when the time arrives that he may enjoy the use and possession thereof. It is allowed as a matter of right and justice, in order that adverse contentions may be concluded before the ravages of time have effaced the evidence, or placed a party at a disadvantage in proving his title."

There are other cases to same effect. See Alley v. Alley, 91 S. W. 291, 28 Ky. Law Rep. 1073; McCormack v. Woods, 14 Bush 78; L. & N. R. Co. v. Thompson, 105 Ky. 190, 48 S. W. 990, 20 Ky. Law Rep. 1110; Elam v. Alexander, 174 Ky. 39, 191 S. W. 666; Frey et al. v. Clark et al., 176 Ky. 661, 197 S. W. 414.

There is a difference between saying a remainderman may sue and saying he must sue; this difference must not be overlooked.

In Salyer's Guardian v. Keeton, supra, the court quoted with approval from Clark v. Parsons, 69 N. H. 147, 39 A. 898, 76 Am. St. Rep. 157, thus:

"But it is urged that Isaac or his sons might at any time after the deed to Berry by Joseph and James, December 14, 1865, have maintained an action to establish their title to the remainder according to the doctrine of Walker v. Walker, 63 N. H. 321, 56 Am. Rep. 514. That case only gives the remainderman the right to establish his title when it is questioned. It is a right of which he may avail himself, or not, as he may elect. If he does avail himself of it and the controversy is decided in his favor, it gives him no right to the possession or to a writ of possession during the existence of the life estate. Until the termination of the life estate no right of entry or right of possession exists in favor of the reversioner. Until the right of entry and the right of possession to the property accrue the statute of limitations does not begin to run against an action for the possession."

So, while a remainderman may bring an action to establish title when it is questioned, "in order that adverse contentions may be concluded before the ravages of times have effaced the evidence, or placed a party at a disadvantage in proving his title," it is a right which he may, or may not, avail himself of, as he may choose. The limitation does not begin to run against him until the termination of the life estate. Inasmuch as there was no order of court disposing of the case referred to, no effect can be given to its mere filing.

By this we mean, not only that the dismissal of this suit was not a determination of the rights of any one, but that, if the filing of it was notice to the Alcorn heirs, that Joseph D. Campbell was claiming any more than an estate for the life of Leroy Alcorn, that the failure to prosecute it, followed by its dismissal, and Campbell's failure to reinstitute it, was notice Campbell had abandoned such claims. The average reasonably prudent man would have so regarded it. We shall have more to say on this subject of notice later in this opinion.

In this suit Campbell described all that land which is shaded in map No. 2. The greater part of this land lay within the Campbell rectangle, A, B, C, D, on maps. Armilda Alcorn's money had paid for Leroy's part of this Campbell rectangle, and it may be that Campbell feared the Alcorn heirs were claiming that also, and that, when he learned they were claiming only a remainder interest in the Daniels tract, he conceded their right thereto and dismissed his action. Just why or on what or whose concessions that suit was dismissed, we know not, but this we know, one of the attorneys for the Alcorn heirs in that suit is a defendant and appellant in this one, and his failure to offer any explanation of its dismissal indicates the defendants had nothing to gain by its disclosure. He was a competent witness on the subject. See 40 Cyc. 2377.

The Superior Oil Corporation et al. place great reliance upon the case of Hargis v. Flesher Petroleum Co., 231 Ky. 442, 21 S. W. (2d) 818, which is, so they say, indistinguishable from this one, but they have not carefully read that case. In that case Hargis entered and held under a void will and brought notice home to the appellees there that he was so holding, by probating the will in question and asserting title under it. In the Hargis case, Hargis had a basis for his claim of the fee,

true it was a void will, but he probated it, entered under it, asserted title under it and, in his conveyances, publicly declared that to be his source of title. One can take under a void will and by holding long enough acquire title by adverse possession. See Stegal v. Brooke, 2 Ky. Opin. 193, and In re Anderson, 2 Ch 70 (English case 1905). We have found no case, in this state, where one having nothing but a life estate has been able by any act or declaration of his own to enlarge that life estate to a fee.

The correctness of this statement is challenged by appellants in their briefs, so we will review the cases they have cited in support of their contention and some other cases of like nature. We shall begin our review with the cases arising under the will of Elizabeth M. Bedford, who died in 1860, for we thus get two cases arising under the same will, held by the same man (Robert Bedford) as long as he lived, which was 27 years, during all of which time he openly asserted his ownership of the fee, and which lands were devised by him at his death to the same devisee; and in each case the commonwealth of Kentucky asserted claim to the remainder under the will of Elizabeth M. Bedford. In one of these cases the state was successful and in the other it was unsuccessful.

In Bedford v. Bedford, 99 Ky. 273, 35 S. W. 926, 18 Ky. Law Rep. 193, the commonwealth successfully asserted its remainder interest under the will of Elizabeth M. Bedford to 735 acres of land because the court there held Robert Bedford had nothing but a life estate, whereas in the case of Commonwealth v. Clark, reported in 119 Ky. 85, 83 S. W. 100, 26 Ky. Law Rep. 993, 9 L. R. A. (N. S.) 750, it was unsuccessful for these reasons: In 1860, when Elizabeth M. Bedford died, a suit was pending by her against the heirs of H. C. Bedinger, for specific performance of a contract by which he had agreed to convey to her 452 acres of land. Robert Bedford believed, and his counsel so advised him, that the devise of the remainder by his mother to the state of Kentucky was void, and, as he was her only child and heir at law, that he took her estate absolutely; therefore, when he filed an amended petition for the purpose of reviving the suit against Bedinger's heirs, he claimed the fee; and on June 7, 1863, it was by order of the court conveyed to him in fee, and he that day put his deed to record. The court held the state of Kentucky could and

should then have taken action to correct the deed made to Bedford, and that limitations started from that time.

These two cases illustrate the rule. One having a life estate and nothing more cannot by any possession, act, or declaration of his own enlarge that estate, and limitation does not run against the remainderman until the life estate falls in; but if, through some act correct or erroneous, valid or invalid, not his own, but of the remainderman or of some one in privity with the remainderman, the apparent life tenant acquires some color of title incompatible with the existence of a life estate and a remainder estate, even though by a void act or instrument, and takes and holds possession thereunder and not as life tenant, and the remainderman knows of such entry holding and possession and of the nature thereof, a cause of action then accrues to the remainderman, and if he takes no steps then, or within the statutory period, he must suffer the consequences.

The reason underlying this is the apparent life tenant has relinquished and repudiated that claim, the remainderman then has a cause of action to obtain possession, the life estate is no more, and if the remainderman does not act he may lose his estate by an adverse possession, for the one who appeared to be a life tenant has abandoned that claim and is claiming under a different title, all of which is known to the remainderman. This state is not alone in so holding, similar holdings have been made by other courts. Hanson v. Johnson, 62 Md. 25, 50 Am. Rep. 199; Balkham v. Woodstock Iron Co. (C. C.), 43 F. 648, 11 L. R. A. 230; Gibson v. Herriott, 55 Ark. 85, 17 S. W. 589, 29 Am. St. Rep. 17; Sutton v. Casseleggi, 77 Mo. 397; Neal v. Davis, 53 Or. 423, 99 P. 69, 101 P. 212.

Here are some Kentucky cases similar to the Clark case and the Hargis case:

### The Treadway Case.

Treadway v. Pharis, 90 Ky. 663, 14 S. W. 909, 12 Ky. Law Rep. 639, involved these facts. In 1848, Pharis bought a tract of land with money belonging to his wife, upon an agreement to have the title taken to her, but which he fraudulently caused to be made to himself. She died shortly thereafter. Pharis remarried. He lived until 1888. After his death the children of his first

wife in an action against his second wife and her children sought to recover this land for themselves, alone. To avoid the plea of limitations they insisted their father was tenant by curtesy and they could not sue until he died. The court held that, while they could not recover possession of the land during their father's lifetime, they could and should have sued to reform this deed and change the character of their father's claim and possession, and they were hence denied the recovery they sought.

## The Baseman Case.

In Baseman's Heirs v. Batterton, 31 Ky. (1 Dana) 432, these were the facts: Catherine Baseman married one Hopper and became the mother of a child, Francis Hopper. Catherine died in 1803 pending a suit for partition of land that had descended to her and others from her father. Shortly thereafter Francis died, whereupon the suit was abated as to Catherine and revived in the name of Hopper as heir at law of Francis, it being his mistaken idea he was heir of his child, whereas he was not, see section 1401, Ky. Stats., but was tenant by curtesy only. That was overlooked, however, and Catherine's share was allotted to Hopper in fee. In 1807 Hopper conveyed it to Batterton. In 1827 Hopper died. Whereupon the Basemans sued Batterton to recover the land. Batterton plead his undisturbed adverse possession for 20 years, and the Basemans, to excuse their nonaction, set up Hopper's curtesy. The court found for Batterton and said the Basemans could and should have sued Hopper in proper time to correct this deed.

## The Webb Case.

In Webb v. Webb, 200 Ky. 488, 255 S. W. 137, the facts alleged were: That Johnathan Webb had been married twice and had two sets of children. In 1904 he conveyed his property to his second wife and his two daughters by her. In 1919 his children by his first wife sought to set aside the deed to the second wife and her children for lack of mental capacity, and to recover this land, claiming their maternal grandfather had bought it for their mother, Artie Webb, and that in 1875 their father had fraudulently procured the conveyance of it to himself, they relied on their father's alleged curtesy to excuse their nonaction and to avoid the plea of adverse

possession. We are only interested in their efforts to reform the deed of 1875, and as to that the court held they were barred by limitations, thus following the Treadway case.

## The Francis Case.

In Francis v. Wood, 81 Ky. 16, the facts involved were: One Thomas Kennedy died the owner of a large tract of land. He had contracted to convey to one Bridges 1,900 acres of this land. In a suit to settle his estate, Mrs. Kennedy claimed dower in this land. Bridges resisted unless reduction were made in the purchase price. 704 acres were allotted her for dower and a satisfactory deduction made from the purchase price. The court should have had only 1,196 acres conveyed Bridges, but erroneously had the entire 1,900 acres conveyed him subject to the dower. Bridges sold to Wood, who also bought the dower. This was in 1842. Mrs. Francis, then an infant, was a party to this suit. After the death of her mother, Mrs. Francis, in 1874, sued for possession of this 704 acres. She had become of age in 1861, and the court held that she should have then taken steps to correct the judgment of 1842, and sustained Wood's plea of limitations, and denied Mrs. Francis any relief.

## THE PATRICK CASES.

In Patrick's Heirs v. Chenault et al., 45 Ky. (6 B. Mon.) 315, and Patrick's Heirs v. White's Heirs et al., 45 Ky. (6 B. Mon.) 330, these were the facts: On June 7, 1791, the state of Virginia issued patents for 1,400 acres of land "to John Patrick and Elizabeth, his wife, the said Elizabeth (being) heir at law to George Calloway, who was heir at law to Richard Calloway, deceased." John and Elizabeth Patrick sold and conveyed at various times and to various parties about 900 acres of this land. Elizabeth died in 1819 and John died in 1824. In 1842 the heirs of Elizabeth began these suits to recover this land. Their suits were bottomed upon these contentions:

(a) That, John Patrick not being an heir of George Calloway who was heir of Richard, he had no interest in this land and should not have been made a patentee.

(b) That Elizabeth, being then an infant, could not make him any assignments of her interest so as to entitle him to an interest in this land and justify including him in the patent.

(c)   That being then under two disabilities, infancy and coverture, excused action on the part of Elizabeth to correct the patent and exclude the name of John Patrick.

(d)   That the conveyances made were so defective as not to pass the title of Elizabeth.

(e)   That John Patrick took an estate by curtesy which excused action on the part of the plaintiffs until he died in 1824.

The defendants controverted all this, and relied on their adverse possession. The court held the plaintiffs failed to establish their proposition (b), the infancy of Elizabeth in 1791. That having failed in that, it followed Elizabeth could have authorized the issual of the patent as it was issued, and that the presumption was she did so. That the patent, issued as it was, created an estate by entirety (a peculiar form of land tenure, then permissible, under our law, and which is described in 30 C. J., p. 566, sec. 99), and upon the death of Mrs. Patrick it was discovered the fee-simple title was in John Patrick. The conveyances were entirely sufficient to pass his title. What the plaintiffs had to do in order to recover was to correct the patents issued in 1791 by eliminating the name of John Patrick therefrom. Mrs. Patrick's coverture, said the court, might have excused her nonaction, but, upon her death in 1919, the plaintiffs, who as her heirs claim to be remaindermen, subject to the life estate of John Patrick, should have taken steps to correct that patent, and, not have taken such steps within 20 years, their right to do so was barred.

## The Doss Case.

In Doss v. Woodson, 206 Ky. 252, 267 S. W. 156, Holland had purchased a tract of land and paid for it with his own money. He had the land conveyed to his wife. A creditor of Holland's sued him and his wife and attacked this deed. The court found the land was really Holland's and it was sold for his debts. Holland bought it at the sale, and it was conveyed to him. In 1890 Holland sold the land to Woodson. When Holland died Doss et al., who are the heirs of his wife, sued to recover this land, claiming it as property descended to them from their mother, Mrs. Holland, and that Holland had only been tenant by curtesy. The court found Holland had not entered as tenant by curtesy, but had been all the

time holding and asserting title as owner in fee and denied Doss et al. the recovery they sought.

There is another line of cases that we think are much in point and we shall call attention to a few of them:

## The Butler Case.

Butler v. McMillan, 88 Ky. 414, 11 S. W. 362, 11 Ky. Law Rep. 23 grew out of these facts. In 1817 Andrew F. McMillan sold by executory contract to Walter Lacy certain land belonging to his wife, Mary McMillan. She was not a party to the sale. This was before the Act of Feb. 23, 1846, by which act curtesy initiate and other common-law rights of a husband in the real estate of his wife were destroyed, see chapter 368, p. 42, Acts 1845-46, p. 8, vol. 2, Revised Statutes, and by this sale there passed what he had, which was his common-law right of use and occupancy of it (curtesy initiate) as long as his wife lived, and as he outlived his wife it also passed his curtesy consummate. Lacy went into possession, and he and Miller, who claims under him, have since had possession. Mrs. McMillan died in 1819, leaving a child surviving. Andrew F. McMillan remarried and had several children by his second wife. He died in 1870. Shortly thereafter, his child by his first wife died intestate and without issue, and this suit was begun by the children of the second wife who are the heirs at law of their half-sister, the child of the first marriage. Adverse possession for 53 years was relied on by Miller, while the McMillans plead the life estate of Andrew F. McMillan to excuse their nonaction. The court held the conveyance of 1817 passed Andrew's life estate, and excused action on the part of the McMillans so long as it lasted. The McMillans were given a judgment, and this court affirmed it.

## Miller v. Shackleford, 3 Dana, 289.

Rachel Shackleford, widow of Bennet C. Shackleford, in 1833 sued to recover land belonging to her, which her husband had in 1809 sold to Wm. Barnett and for which she and her husband had made Barnett a deed in 1811, he having been in possession since 1809. She relied on the insufficiency of the deed of 1811 to pass title to her estate in the land. Miller relied upon his 24 years of adverse possession, 14 before the death of Mr. Shackle-

ford and 10 thereafter, while, to excuse her non-action, Mrs. Shackleford insisted the conveyance was valid as to her husband, and she had no right of entry until his death in 1823, which position the court upheld. We think it well to quote some pertinent excerpts from that opinion.

"It would seem, indeed, to be self-evident, that there must be a right of entry to be barred by lapse of time, before time could begin to operate as a bar.

. . .

" 'Length of possession during a particular estate, as a term of one thousand years, . . . give[s] no title.'

"No title can be barred by mere length of possession, unless the possession is adverse."

We shall now cite some cases in which the question of adverse possession and claim of a fee were involved, where this court has held remaindermen were not barred by the lapse of time during the existence of the life estate, and shall give in each case the number of years that had elapsed: Phillips v. Williamson, 184 Ky. 396, 212 S. W. 121 (19 years); Bates v. Adams et al., 182 Ky. 100, 206 S. W. 163 (19 years); Boggess v. Crail, 224 Ky. 97, 5 S. W. (2d) 906 (42 years); Fox v. Faulkner, 222 Ky. 584, 1 S. W. (2d) 1079 (32 years); Smith v. Richey, 185 Ky. 516, 215 S. W. 429 (47 years); Bidwell v. Bishop, 200 Ky. 817, 255 S. W. 828 (31 years); Black v. Black, 51 S. W. 456, 21 Ky. Law Rep. 403 (63 years); Jeffries v. Butler, 108 Ky. 531, 56 S. W. 979, 22 Ky. Law Rep. 226 (42 years); Turman v. White 53 Ky. (14 B. Mon.) 560 (41 years); Fisher v. Haney, 180 Ky. 257, 202 S. W. 495 (25 years); Jackson v. Claypool, 179 Ky. 662, 201 S. W. 2 (22 years); Duncan v. King, 163 Ky. 577, 174 S. W. 34 (51 years); Kelly v. Pettus, 145 Ky. 250, 799, 140 S. W. 189 (55 years); Ratterman v. Apperson, 141 Ky. 821, 133 S. W. 1005 (17 years); Green v. Jones, 169 Ky. 146, 183 S. W. 488 (27 years); Carpenter v. Moore-lock, 151 Ky. 506, 152 S. W. 575 (35 years); Holmes v. Lane, 136 Ky. 21, 123 S. W. 318 (39 years); Penn v. Rhoades, 124 Ky. 798, 100 S. W. 288, 30 Ky. Law Rep. 997 (41 years). These citations could be much extended, but it would serve no useful purpose, as the rule that limitations do not run against remaindermen during the particular estate is thoroughly established. One casually and carelessly looking over this list might think it

strange that the 30-year statute (section 2508) did not apply, as that statute expressly says it applies to all disabilities, but the answer to that is that *being a remainderman is not a disability.* All statutes of limitations begin to run from the accrual of the cause of action, and a remainderman has no right to entry, no cause of action, until the death of the life tenant.

At common law a remainder could not be created without a particular estate to support it, the reason being that an estate of freehold of inheritance could not be created without delivery of possession; therefore it was necessary that there be a tenant of the particular estate to whom possession could be delivered, and the possession of this tenant of the particular estate thus became and was the possession of the remainderman. It was his duty to hold possession for the remainderman. The relation of a life tenant to a remainderman is somewhat like that of a tenant to his landlord. He holds possession for him. A tenant's possession does not become adverse to his landlord until he repudiates his landlord's title and brings knowledge of that repudiation home to the landlord. Fordson Coal Co. v. Mills, 234 Ky. 64, 27 S. W. (2d) 382. Because of the analogy of the relations we would expect to find the law requires of life tenant some similar act before he could set up a title hostile to his remainderman. We find it written this way in 17 R. C. L., p. 643, sec. 33:

> "The possession of a life tenant cannot be adverse to the holder of the legal title in remainder, and accordingly the tenant for life cannot acquire an outstanding paramount title and gain any rights as against the remainderman by claiming thereafter to hold by adverse possession, unless it appear that he had clearly renounced all claim as tenant, to the knowledge of the remainderman." "Where however, one who is tenant for life takes possession not as life tenant but under claim of absolute ownership, and has recorded the evidence of his title to that effect, his possession is hostile and adverse to all, including the remainderman." To same effect, see 21 C. J. 972, sec. 122, and page 1013, sec. 173.

In the light of this let us look at these cases again. In the Hargis case, 231 Ky. 442, 21 S. W. (2d) 818, and the Stegal case, 2 Ky. Opin. 193, the supposed life tenants

entered not as such but as the owners of the entire estate under wills they asserted and probated as valid.

In Commonwealth v. Clark, 119 Ky. 85, 83 S. W. 100, 26 Ky. Law Rep. 993, 9 L. R. A. (N. S.) 750, the Francis case, 81 Ky. 16, and the Baseman case, 31 Ky. (1 Dana) 432, the supposed life tenants entered not as life tenants but as owners of the fee under deeds erroneously ordered to be so made them by the court.

In the Treadway case, 90 Ky. 663, 14 S. W. 909, 12 Ky. Law Rep. 639, and in the Webb case, 200 Ky. 488, 255 S. W. 137, the supposed life tenants entered under deeds conveying them the entire estate, which deeds those claiming to be remaindermen alleged were fraudulent.

In the Patrick cases, 45 Ky. (6 B. Mon.) 315 and 330, the entry was made under patents which the alleged remaindermen claimed were fraudulently and erroneously issued. In the Doss case, 206 Ky. 252, 267 S. W. 156, the court found Holland had never entered as a life tenant, but had always held and claimed a fee.

In each case the alleged estates in remainder were under a cloud. In each instance there was some step for them to take to clear up their title to the estate in remainder. If they had any interest it was an "executory interest," as defined in 21 C. J., p. 215, sec. 213, it was something they might gain by timely steps, and was not a vested interest. See 21 C. J., 255; 21 C. J., p. 251, sec. 251.

They were not remaindermen at all, but were excluded from all interest in the property by the claims under which the alleged life tenants had entered. In each instance, if they hoped ever to get any thing, it behooved them to begin fighting then.

The contention is made that, *when a life tenant, while holding as such, brings home to the remaindermen, by clear and convincing evidence, notice of his intention to claim the entire estate in fee, the statutes of limitations start running eo instante.* Is that the law? Is that enough? Those questions squarely confront us. Those or similar words appear in the separate concurring opinion in Hargis v. Flesher Petroleum Co., 231 Ky. 442, 21 S. W. (2d) 818, in Bates v. Adams, 182 Ky. 100, 206 S. W. 163, and in Russell v. Tipton, 193 Ky. 305, 235 S. W. 763, but always as a dictum, they have been just slipped in as

sage observations, but never has there been a decision rested upon them.

> "A statement of law in an opinion makes a precedent, not because it is made by a wise, and learned man, but because it is made by a judge in his official capacity as a judge and about a matter that is before him as a judge. If it is not so made, it is dictum. The test is whether the statement was or was not necessary to the determination of the issues raised by the record and considered by the court." Utterback v. Quick, 230 Ky. 333, 19 S. W. (2d) 980, 983.

We feel bound by things said in our opinions, not because we said them, but because we had to say them to reach the conclusions to which we came. We will continue our consideration of this italicized statement to see if it can be the law, even though we are unable to find an opinion rested upon it.

In determining its sufficiency we will be assisted by considering what is sought to be accomplished by it. The thing sought to be accomplished is to bar the plaintiffs' cause of action, by making it appear they have had a cause of action for many years, in fact for such a number of years, that, having failed to assert it during all that time, its assertion is now barred by the statutes of limitations; therefore it follows this notice must be sufficient to have given the plaintiffs a cause of action.

What sort of a cause of action must it afford the plaintiffs? Will it be sufficient if it affords plaintiffs the right to sue to remove the cloud upon their title to the remainder interest in this land? No, because actions to quiet title do not come within a statute of limitations fixing the time for bringing actions for the recovery of real property. See 18 R. C. L., p. 715, sec. 71.

The statute the appellees rely upon here is section 2505, which provides: "*An action for the recovery of real property can only be brought within fifteen years after the right to institute it first accrued to the plaintiff, or to the person through whom he claims.*"

Therefore, in order to succeed, these appellees must bring this case within the terms of that statute, and must show this notice was sufficient to have enabled the Alcorn heirs to have sued *to recover* this property. It is not enough that it afforded them a cause of action quia timet

to remove a cloud upon their title. They could bring or not bring an action quia timet as they saw fit, see Salyer's Guardian v. Keeton, 214 Ky. 643, 283 S. W. 1015; Walker v. Milliken, 150 Ky. 12, 150 S. W. 71, Ann. Cas. 1914C, 742, but, if ever the appellees by their notice gave plaintiffs a cause of action to recover this property (that is a right of entry), then the plaintiffs must sue within 15 years or be forever barred.

So it comes down to this: Did any of the appellants bring home to the plaintiffs such notice of an adverse holding as to accelerate the remainder and give to the plaintiffs a right to entry? That is, have they brought home to the plaintiffs notice that they have repudiated their holding through Leroy Alcorn's tenancy by curtesy, thereby accelerating the remainder, and are claiming title through some other and adverse source?

The test of that is what would the court have done upon consideration of a demurrer to a petition filed in April 1903, by these Alcorn heirs, alleging the death of Armilda Alcorn intestate, in ownership of and possession of this property, its devolution to Leroy Alcorn for life with remainder to the plaintiffs, that Leroy Alcorn had repudiated his life estate by executing a deed to Joseph D. Campbell, in which he purported and attempted to convey him the entire estate and had asked for a partition of this land, and that Joseph D. Campbell and Leroy Alcorn be adjudged to have no rights therein? The answer is obvious, the court would sustain such a demurrer without hesitating and say to the Alcorn heirs:

"You must wait until Leroy Alcorn dies, he has not repudiated his life estate, you have no right of entry no cause of action. See section 2291, Ky. Stats."

The court's supposed action would be supported by Robinson v. Miller, 41 Ky. (2 B. Mon.) 284, where this question was decided. The attempt by the life tenant to convey a fee does not accelerate the remainder. See McIlvain v. Porter, 7 S. W. 309, 8 S. W. 705, 9 Ky. Law Rep. 899, Jeffries v. Butler, 108 Ky. 531, 56 S. W. 979, 22 Ky. Law Rep. 226, and section 2291, Ky. Stats.

That solves the problem, that is all that has been done. It is not enough. The matter we have italicized does not go far enough. To start the statute running

against a remainderman, one apparently a life tenant must bring home to the remainderman such notice of the basis of his adverse holding as to indicate to a reasonably prudent man that the life tenant has repudiated his life tenancy, no longer claims thereunder, and is basing his holding upon some other and adverse claim of title, and that the remainderman then has a right of entry because of the resulting acceleration of the remainder.

Measured by this rule the conveyance to Joseph D. Campbell was not enough, nor was the suit by Joseph D. Campbell enough, for all he does in that suit is he describes the tract shaded on map No. 2, and then adds that the Alcorn heirs are claiming some interest therein through their mother, Armilda Alcorn, from whose husband he acquired this property under a deed of general warranty. He does not allege the source of Leroy Alcorn's adverse title, or, indeed, that he had an adverse title, or make any other allegation to show he was holding otherwise than a tenant for the life of Leroy Alcorn. There is nothing in it that would afford the Alcorn heirs any notice he had repudiated his life tenancy, was holding under a different and adverse title, that the remainder had been accelerated, or that would give the Alcorn heirs a right of entry. The case of Robinson v. Miller, 41 Ky. (2 B. Mon.) 284, supports this.

Appellees also rely upon the case of Wooton v. Murrell, 134 Ky. 45, 119 S. W. 191, but that case went off on the question of laches, which do not apply to a vested right such as the Alcorn heirs are asserting here. 21 C. J. 215, sec. 513, p. 251, sec. 251. Combs v. Ezell, 232 Ky. 602, 24 S. W. (2d) 301 and Elkhorn Land & Improvement Co. v. Wallace, 232 Ky. 749, 24 S. W. (2d) 560, 563, are relied on, but those are co-tenant cases and are not applicable.

Of course these Alcorn heirs could have brought a suit quia timet, to quiet their title, they could have brought a suit for waste, if any, and there probably was, or they could have sued to enjoin the sinking of these wells, but they did not have to do so. See Salyer's Guardian v. Keeton, 214 Ky. 643, 283 S. W. 1015, and Walker v. Milliken, 150 Ky. 12, 150 S. W. 71 Ann. Cas. 1914C, 742, this question being thoroughly discussed in the latter case, and in both these cases it is settled adversely to the contention of the appellants.

We are not concerned with other suits the Alcorn heirs might have maintained; our question is, When was the first time they could have maintained a suit for possession like this one? This is the suit the appellants hope to defeat, and in order to succeed they must show this one could have been maintained if brought 15 years or more before it was. They have failed to do so.

In Stevens v. Winship, 1 Pick, (Mass.) 318, 11 Am. Dec. 178, and oft-cited cases, the heir of the life tenant, when sued by the remainderman for recovery of the property, made a rather novel defense; it was that, during the life tenancy, the life tenant had by making certain deeds and mortgages forfeited her life estate and thus given to the remainderman a right of entry and started the statute running. The court held the remainderman could waive the forefeiture and had done so, that the statute did not start, and gave judgment for the remainderman. See 21 C. J., p. 970, sec. 116, King v. Mimms, 37 Ky. (7 Dana) 267.

In like manner these Alcorn heirs could waive their right to sue for waste, etc. Here is the vital thought we must ever keep in mind and we will not fall into error: *Adverse possession never runs against a man unless he can stop it.*

When we find that time when the Alcorn heirs could first have put an end to the possession of those claiming under Leroy Alcorn, then we have found the time the statute began to run. That time was May 30, 1919, when the last breath went out of Leroy Alcorn. Then, and not until then, the running of the statute started.

It is often suggested in cases such as this, and it is suggested here, that it is desirable that titles be settled, and lands left in the hands of those who are actively endeavoring to develop and exploit them. That argument is based on expediency and not on the law. There were here two independent titles for the law to protect: The life estate of Leroy Alcorn and the estate in remainder of the Alcorn heirs. Both must be protected, and the claimants of this estate in remainder were helpless while this life estate existed.

During that period they were powerless to protect themselves. The helpless are the particular favorites of the law. Those are the people for the protection of whom governments are established, people who are unable to protect themselves.

In O. V. F. & M. Ins. Co.'s Rec'r. v. Skaggs, 216 Ky. 535, 287 S. W. 969, 970, we said:

"The essence of the ownership of a thing is that aid which organized society will through the courts, as its agents, give to one individual to the exclusion of all others, to take or keep possession of it."

Courts recognize the ownership of a remainderman, during the life estate, and are then powerless to put him in possession, but they watch over his interests with a jealous eye until the time comes when they can. For example, here are some things we have said:

"His effort, while in possession as life tenant by curtesy, to disparage the title of his infant children in the fee, and to establish in himself a better and hostile title thereto, is unconscionable and violative of every equitable principle." Bates v. Bates, 182 Ky. 566, 206 S. W. 800, 802.
"Courts, with a degree of uniformity, hold that a tenant in possession cannot acquire an outstanding title hostile to the ownership of the particular estate; it being the duty of the owner of the life estate or tenant to protect the remaindermen." Slusher v. Slusher, 102 S. W. 1188, 1190, 31 Ky. Law Rep. 570; Scott v. Proctor, 13 S. W. 790, 12 Ky. Law Rep. 57. See 21 C. J. 941, sec. 73, and 942, sec. 74.

When one receives an estate in remainder he is just like one who acquires any other species of property, he must then see that the title is clear and the legal title to an estate in remainder is then vested in him. Such precautions were not taken in the Hargis, Stegal, Clark, Francis, Baseman, Treadway, Webb, Patrick, and Doss cases, hence the resulting discomfiture of those alleged remaindermen. When the remainderman has assured himself the legal title is vested in him, all that he has to do is watch the clock go round until the life estate falls in and he comes into possession of his own.

The life tenant is liable for waste, section 2328, Ky. Stats.; he must make the necessary repairs, Prescott v. Grimes, 143 Ky. 191, 136 S. W. 206, 33 L. R. A. (N. S.) 669, 21 C. J. 951, sec. 90.; he cannot charge against the remainderman improvements he may make, Frederick v. Frederick, 102 S. W. 858, 31 Ky. Law Rep. 583, 13.

L. R. A. (N. S.) 514; 21 C. J. 953, sec. 91; he must to the extent of the income pay the interest on encumbrances, Todd v. Owen F. N. B., 173 Ky. 60, 190 S. W. 468; 21 C. J. 959; he must pay the taxes, May v. C. & O. R. Co., 184 Ky. 493, 212 S. W. 131; 21 C. J., p. 955, sec. 93; and he has other burdensome obligations; he cannot buy an adverse claim to the estate and assert it against the remainderman, Scott v. Proctor, 13 S. W. 790, 12 Ky. Law Rep. 57; and no matter how often, how loudly, how long, or how openly he proclaims himself to be the absolute proprietor, his estate is not thereby enlarged, Salmon v. Davis, 29 Mo. 176. The protection of the remaindermen is not limited to a mere presumption, the possession of the life tenant is not adverse, it cannot by any possibility become adverse. The life tenant must cease to be life tenant, must renounce that relation, must do enough to accelerate the remainder and bring home to the remainderman by clear and convincing evidence notice that he has done so and is holding under another and adverse title before his possession can become adverse to the remainderman. It is such other estate that then becomes adverse, not the life estate.

In Doss v. Woodson, 206 Ky. 252, 267 S. W. 156, 157, we said:

"If Holland had entered as a life tenant or tenant by curtesy, . . . he could not divest himself of such life tenancy and become an adverse claimant of the fee, except and until he abandoned all connection with the life estate, and re-entered as an adverse claimant."

One entitled to a life estate may repudiate that right and elect to claim the estate under some other, a different, or an adverse title, and if he does, the maturity of the remainder is accelerated, and the remainderman becomes just as fully entitled to the immediate possession as if the life tenant has died. Peynado v. Peynado, 82 Ky. 5; Woods v. Woods, 58 Ky. (1 Metc.) 512; Trustees et al. v. Morris, 99 Ky. 317, 36 S. W. 2, 18 Ky. Law Rep. 384; Timberlake v. Parish, 35 Ky. (5 Dana) 346; Gale v. Miller, 19 Ky. (3 T. B. Mon.) 416; Jones v. Knappen, 63 Vt. 391, 22 A. 630, 14 L. R. A. 293; 23 R. C. L., p. 556, sec. 103, 21 C. J., p. 994, sec. 148.

When we speak of the renunciation or repudiation of a life estate we mean such an unequivocal act by the

life tenant as would destroy his claim as life tenant, so that he could not thereafter assert it, and would accelerate and mature the remainder.

The remainderman ultimately succeeds to the possession of the life tenant, but he does not succeed to his title, the remainderman gets title from another and independent source, and not by descent from the life tenant, hence he takes his remainder free and clear of all debts of the life tenant, even from the possession of one who holds under a deed given him for purchase of the property under a sale made for taxes assessed against it during the life tenancy. Smith v. Young, 178 Ky. 376, 198 S. W. 1166. As one writer quaintly puts it, all the remainderman has to do is sit in his rocking-chair and wait.

The law, relative to the relation of co-tenants to each other, must not be confused with that relative to a life tenant and the remainderman. Each co-tenant has all the time a right of entry. If cotenant X is in possession of the entire property, co-tenants Y and Z can terminate his possession of their parts when they choose, but a remainderman is powerless, until the life tenant dies, or else says to the remainderman in clear and unequivocal language, I am not holding as life tenant, but under a deed from B, the will of C, or such other title as he relies on to give him another, a different, and an adverse claim to the estate. The remainderman can not put a stop to the life tenant's possession; therefore there is no adverse possession that can run against the remainderman, until and unless the apparent life tenant shall clearly, convincingly, and unequivocally bring home to the remainderman such notice that he does not hold as life tenant as would apprise a reasonably prudent man he had renounced that relation and was holding under another, a different and an adverse title, so he could not rely upon the life tenancy, if the remainderman then sued for possession. That would mature the remainder by acceleration and start the statute. Those claiming under Leroy Alcorn here have not done anything that even approaches that requirement. Never has there been a time that reasonable prudence would not have anticipated a claim under Leroy's life estate would be interposed as a defense to any suit by the Alcorn heirs for possession.

A remainderman does not have to sue for possession and hope the rights under the life estate may not be asserted against him, he is not required to sue, until as

a reasonably prudent man he knows such rights have been ended either by death or unequivocal renunciation and cannot be asserted against him. One cannot, while sheltering under and enjoying a life estate, be maturing a claim to the property by adverse possession against the remainderman.

If he is entitled to a life estate in the property and has some other and adverse claim to it, he must make his election unequivocably and irrevocably, and if he enters he will be presumed to have entered and to have continued as life tenant, unless he shows by clear and convincing evidence he then brought home to the remainderman notice he was entering or holding, not as life tenant, but under his adverse claim, whatever it was, and apprised the remainderman of the nature thereof. He must deal fairly and openly and cannot fatten upon undisclosed claims and intentions of his own. A claim having no foundation other than one's secret intention is without foundation. Myers et al. v. McMillan's Heirs, 34 Ky. (4 Dana) 485.

Therefore an apparent life tenant who expects to claim the fee must disclose that intention to the remainderman, and must advise him of the nature of his title, must disclose the basis of his claim. The apparent life tenant may have concluded in his own mind his holding under his undisclosed claim or title will be adverse to the title of the remainderman, but it is not sufficient for him to merely notify the remainderman his holding is adverse. The remainderman does not have to act upon the conclusions of the life tenant, and is entitled to be apprised of the facts, so that he may determine for himself, or if the matter should reach the courts that those tribunals can determine, whether or not the holding is adverse. The remainderman is entitled to know the facts, from which he can draw his own conclusions about the situation confronting him and as a reasonably prudent man shape his course accordingly.

If the apparent life tenant is not in fact so holding, he must advise the remainderman he is not and disclose just how and why he is holding, else he will be presumed to hold just as he appears to hold. We are persuaded this rule is wise, and that a rule requiring less would be unwise; for example, we will suppose that H, a widower with two children, married W, a widow with one child, in 1888. H owes many debts, but earns good wages,

which he gives to W, who saves what she can and with the hoard purchases a home for $600, before 1894. Deed is made to W. One child is born to H and W, and dies when 6 months old.

In 1900 W dies, leaving a will, by which she devises this home to H for life, with remainder to S, her son by her first marriage. H feels this home should at his death go to his children and not to his stepson, and accordingly he disclaims the life estate devised him as he may do. See Baldwin v. Cook, 232 Ky. 365, 23 S. W. (2d) 601.

H secretly intends to claim an estate by curtesy, which he honestly, but erroneously, regards as adverse to the title of S, and H serves notice on S he has disclaimed the devise made him and is holding by an adverse title, that is all he says. Thus S is goaded into bringing a perfectly useless and unprofitable suit. H might claim homestead and make similar claim, and, if necessary, we could give other illustrations, but this is enough to illustrate the wisdom of requiring the apparent life tenant to disclose the basis of his holding.

The vast majority of the courts hold that a life tenant is a trustee for the remainderman, see 21 C. J. 941, sec. 73, but we think it better to call him a quasi trustee. He is a trustee in the sense he cannot destroy or dispose of the property to the injury of the rights of the remainderman, but, unlike the trustee of a pure trust, he may use the property for his exclusive benefit, and take all the income and profits, so long as he preserves the corpus of it; anyway the relations of the life tenant to the remainderman are such as to require of the former the utmost good faith in his dealings with the latter, that he do not annoy him by groundless alarms or incite him to begin unnecessary litigation.

The apparent life tenant has the right to possession, the remainderman has not, all litigation is vexatious and expensive, and unsuccessful litigation is doubly so; hence a disclosure of the nature of his claim is important to enable the remainderman to know if the apparent life tenant has in fact renounced his rights as such, and that he is asserting a claim that is hostile and adverse to the title of the remainderman, for we must remember the apparent life tenant proposes to take possession or to remain in possession, and the remainderman is entitled to know how and why. The prudent remain-

derman will shape his course from his observation of the acts and conduct of the apparent life tenant, and the latter will not thereafter be allowed to say the nature of his possession was other or different from what it appeared to be.

> "Where a party is in actual possession and has a right to possession under a legal title which is not adverse, but claims the possession under another title which is adverse, the possession will not in law be deemed adverse." Nichols v. Reynolds, 1 R. I. 30, 36 Am. Dec. 238, citing 2 Stark 657, 5th Ed.

In the ten cases we have discussed, where apparent life tenants by their holdings established in themselves a fee, there was in each case a full disclosure of the basis of the life tenant's claim, and we now hold there must be. In this case there was none. Leroy Alcorn and Joseph D. Campbell simply held, that was all. That is not enough.

By the common law, a tenant for life, who executed a deed conveying the property in fee, forfeited his life estate, accelerated the remainder, and gave the remainderman an immediate right of entry. See Blackstone Book 2, p. 274. This has been remedied in this state by this statute, section 2291:

> "A conveyance made by a tenant for life or years, purporting to grant a greater estate than he has, shall not work a forfeiture of his estate, but shall pass to the grantee all the estate which such tenant could lawfully convey."

When this statute first was passed we have not thought important to learn, it was a part of the Revised Statutes adopted in 1851, and the notes in the first publication of those statutes in 1852 indicate it was adopted from a still earlier statute.

The effect of that statute was to make of the conveyance by Leroy Alcorn to Joseph D. Campbell a conveyance of his life estate and no more, just as effectually as if it were written therein:

> "This only conveys an estate for the life of Leroy Alcorn."

Old laws are not soon forgotten, and long after they have been repealed we find them lingering in the thoughts and customs of the people, and in this case our attention is solemnly called to the fact that Leroy Alcorn conveyed this property in fee to Joseph D. Campbell, and that the Alcorn heirs should then have taken steps to protect their rights. What if he did? That did not forfeit the life estate or accelerate the remainder estate of the Alcorn heirs. But, say the appellees, the deed was recorded. What if it was? It was not within the chain of title of the Alcorn heirs. They do not have to take notice of it. 39 Cyc. 1728. That they do not take title from Leroy Alcorn we have already pointed out, but suppose they did know all about it, and perhaps they did, what difference does it make? They know the law and know the effect of sections 2291 and 2351, so there is nothing in this deed that affects them, yet our attention is solemnly called to it. The effects of the old common law have not been forgotten, and there is still a feeling the Alcorn heirs should have done something about it when they heard of it, yet we have decided over and over again that an attempt by the life tenant to convey the fee did not affect the remainderman or his interest in the least. Gholson v. Desha, 107 S. W. 330, 32 Ky. Law Rep. 996; May v. C. & O. R. Co., 184 Ky. 493, 212 S. W. 131; Belcher v. Polly, 106 S. W. 818, 32 Ky. Law Rep. 623; Middleton v. Ball, 182 Ky. 163, 206 S. W. 275; Justice v. May, 176 Ky. 78, 195 S. W. 98; Rittenhouse v. Porter (Ky.) 128 S. W. 288; Luigart v. L. T. C., 130 Ky. 473, 113 S. W. 814. See also, 21 C. J., p. 972, sec. 122; 21 C. J., p. 960, sec. 96; 23 R. C. L., p. 567, sec. 116.

It is insistently contended that the Alcorns could have maintained an action to quiet their title on November 24, 1900, to convert the title conveyed to Joseph D. Campbell by their father, Leroy Alcorn, from a fee to an estate for their father's life. A complete answer to that is there is no reason for so doing when section 2291 and section 2351 of the Statutes had already done that very thing. We are going to quote here what we said in Walker v. Milliken, 150 Ky. 12, 150 S. W. 71, 73, Ann. Cas. 1914C, 742:

"It is true that at an earlier time she might have brought some action, not for the recovery of, but for the protection and preservation of, her interests in the fund. She might have asked the court

that bond be required of J. A. McGoodwin, or that he be removed, or that he be compelled to invest the fund again in bonds, just as a remainderman, as was held in the cases supra, might, before the ending of the preceding life estate bring an action to preserve the estate that it might be present and protected for enjoyment when the remainderman's right to the enjoyment first became in esse at the termination of the particular estate; but does not have to do so, as was specifically held in the case of Kellar et al. v. Stanley, 86 Ky. 240, 5 S. W. 477, 9 Ky. Law Rep. 388.''

In Kellar v. Stanley, 86 Ky. 240, 5 S. W. 477, 479, 9 Ky. Law Rep. 388, we said:

"It has been repeatedly held that limitation does not, during the existence of the particular estate, run in favor of the tenant for life, against the owner of the estate in remainder, and, that being so, it would seem that an action to quiet his title might be maintained by the latter at any time before the termination of the life-estate; for it is difficult to understand how the right to quiet title, or establish a claim to land, may be barred by limitation, while the right to recover the same land may exist for an indefinite period afterwards.''

We have already quoted from Salyer's Guardian v. Keeton, 214 Ky. 643, 283 S. W. 1015, on this same question. We will now quote from Bohrer v. Davis, 94 Neb. 367, 143 N. W. 209, 211, L. R. A. 1918D, 430, Ann. Cas. 1915A, 992, where the Nebraska court said:

"Hence it follows that the statute of limitations does not run against any possessory action in favor of a reversioner or remainderman until the extinguishment of the estate of the tenant for life. . . . The fact that the reversioner did not pursue his remedy to remove a cloud from his title appears to us to be immaterial. It has always been the law that any one might resort to a court of equity to remove an apparent cloud upon his title, and statutes are now in force in many of the states under the provisions of which one may call upon any one asserting an adverse claim to his property to litigate such claim,

and to submit it to judicial determination. If persons holding estates in remainder or reversion, and therefore not entitled to the immediate possession of the property, must exercise the right thus conceded to them in equity or by these statutes or be met with a presumption that every conflicting claim accompanied by the possession is valid, these rights of action operate as so many snares. These equitable remedies, by which one claiming an estate or interest in land may appeal to the courts to determine it, were designed for his protection rather than his destruction, and the fact that he does not resort to them ought not to be regarded as an irrevocable abandonment of those remedies to which he is otherwise entitled.''

Quia timet is not a cause of action, it is a right of action of a continuing nature. We shall close our discussion of this feature by this quotation from 17 R. C. L. 715: ''Care must be used in distinguishing between a proceeding to quiet title with its immunity from the operation of the statute of limitations and other actions of similar nature which are subject to this statute.''

In our investigation of the questions presented in this case, there are some foreign cases we have found so often cited that we think it well to list them here for the benefit of the profession. Gindrat v. Western R. Co., 96 Ala. 162, 11 So. 372, 19 L. R. A. 839; Webster v. Pittsburg, C. & T. Co., 78 Ohio St. 87, 84 N. E. 592, 15 L. R. A. (N. S.) 1154; Allen v. De Groodt, 98 Mo. 159, 11 S. W. 240, 14 Am. St. Rep. 626; Bohrer v. Davis, 94 Neb. 367, 143 N. W. 209, 210, L. R. A. 1918D, 430, Ann. Cas. 1915A, 992. All of these cases in the last-named reports are followed by valuable notes. We shall make this quotation from the case last cited:

''The universal rule of law is that the statute of limitations does not begin to run against a right of action until that right exists. The party who has the right of action has the full period of the statute in which to enforce it. The remainderman has no right of possession until the particular estate is terminated. He has no right of action which depends upon the right of possession until he is entitled to the possession. The plaintiff says that the statute begins to run when there is an ouster or disseisin,

and that a deed by a tenant to a stranger, purporting to convey the whole estate for full value actually paid and possession thereunder, operates as ouster of the remainderman. There are many authorities so holding, but never unless the remainderman by such sale and conveyance becomes entitled to possession. In the cases so holding it is also held that the tenant by such sale and conveyance forfeits his estate.''

By section 2291 of our Statutes such a forfeiture does not result in this state, hence a deed by a life tenant purporting to convey the fee only passes a life estate and such a deed does not affect the rights of the remainderman at all.

It has been suggested that the life tenant should not be required to renounce his life estate or to disclose the basis of his adverse claim, but that he need only notify the remainderman he was holding adversely, and, if the remainderman did not sue to remove the cloud on his title, the statute should start running.

There is no better way to test the sufficiency of a rule than to look at the mischief that can be done under it. Under such a rule a life tenant X could notify the remainderman Y that he (X) was holding by an adverse title. Y sues to remove the cloud, the answer of X discloses X is claiming under a deed from A, an entire stranger to the title, so the court enters a judgment quieting the title to the life estate in X and the remainder in Y. In a few days X serves another notice on Y that he is holding adversely, and another suit discloses X had taken a deed from B, another stranger, and a similar suit and judgment follows, and so on until the resources of Y are exhausted, for X all the time is feasting on the life estate, while Y has nothing, but according to the suggested rule the statute would start each time X served a notice. How could a more fallacious rule be devised?

The contentions made in appellant's brief that the deed from Caroline Wheeler to Armilda Alcorn was champertous, for the reason that Leroy Alcorn was at the time of its execution in the adverse possession of the Daniels land, and that the deed was void, because there was no evidence as to whether the grantor was married or single, are both without merit. It has just been held that at the time of the execution of that deed Leroy Alcorn had no possession of the Daniels land which the

law recognizes. Whether Caroline Wheeler was a married woman, a widow, or had never been married, is immaterial. The title emanates from Armilda Alcorn, under whom both parties must claim. Any defect back of her deed is of no consequence.

The judgment of the trial court being in accord with this opinion, it is affirmed.