## Bates v. Adams, et al.

(Decided November 19, 1918.)

### Appeal from Knott Circuit Court.

1. Life Estates—Purchaser of—Adverse Possession—Limitation.— The purchaser from a life tenant by his use of the land or assertion of claim to it while holding as life tenant will not have the effect of converting his amicable use and possession into an adverse holding, or start the statute of limitation in his favor.

2. Tenancy in Common—Adverse Possession.—Where one joint tenant is in possession of the land owned in common with other joint tenants, he cannot assert title to the whole by adverse possession until he has brought home to the other joint tenants by clear and convincing evidence notice of his intention to set up title in himself as against them and has so asserted title for the statutory period.

EDWARD C. O'REAR, J C. JONES, J. M. BAKER and A. J. MAY for appellant.

SMITH & COMBS and J. P. HOBSON & SON for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In May, 1915, this suit was brought by six of the seven children of John B. Adams, who died many years

ago, against Robert Bates, the appellant, to quiet their title as the heirs of Adams to six-sevenths of the land described in the petition, it being alleged that Bates, under a deed made in 1890, was the owner of the dower interest of Adams' widow, and also the owner of the remainder in fee of an undivided one-seventh of the land by purchase of the interest of one of the children of Adams.

In answer to this suit Bates, after denying the ownership of the Adams children or their ancestor, John B. Adams, to any part of the land described in the petition and pleading ownership in himself under deeds from various parties as well as under a deed from James Hamilton, made in November, 1893, also relied on adverse possession and limitation. A reply by the Adams children put in issue the averments of the answer, and thereafter there was a trial by a jury and a verdict that awarded the Adams children five-sevenths of the land in controversy (it appearing on the trial that Bates had also bought the interest of another one of the Adams children) and a judgment accordingly, to reverse which Bates prosecutes this appeal.

It appears from the record that Robert Hamilton died about the year 1862 leaving five children. In 1867 one of the children named Lucy married John B. Adams and a few years after their marriage John B. Adams, as is claimed by the children, purchased from James Hamilton, a son of Robert Hamilton, the share of his father's estate which was alloted to him in the division. It is further claimed by them that at the time of the purchase the price was paid in cash and a title bond executed by James Hamilton to Adams for the land. It also appears from evidence in their behalf that John B. Adams took possession of the land and held it until his death in the year 1881, and that his widow and children continued to hold and use it for some years after his death.

John B. Adams left surviving him his widow and seven children and in 1884 the widow married Jason L. Craft, who soon afterwards purchased the interest of Margaret Adams, one of the children of John B. Adams, in the land that he had bought from James Hamilton, and in September, 1890, Craft and his wife conveyed to Robert Bates the one-seventh interest which Craft had

purchased from Margaret Adams and Mrs. Craft's life estate in the land as widow of John B. Adams, and in addition fifty acres owned by Craft, the deed reciting that Craft sold and Bates purchased "one-seventh part of the John B. Adams, deceased, farm, which I bought of Margaret Martin, on the waters of Carr's Fork of the Kentucky river, and bounded as follows, to-wit: On the north by the lands of Robert Bates; on the east by the lands of Jasper Collins; on the south by the lands of Austin Vance; and on the west by the lands of Robert Bates; also one fifty acre survey in the name of Jason Craft, lying on the Rope Works Fork of Carr's Fork of the Kentucky river, or so much of said survey as was on vacant land when surveyed; also Lucy Craft's lifetime dower in the John B. Adams tract of land, lying on the Rope Works Fork of Carr's Fork, Knott County, Ky., which part she was entitled at the death of John B. Adams, which I was said Adams' wife at that time of his death.''

From this brief statement it will appear that the Adams children claimed the remainder interest in the land in controversy which the weight of the evidence shows to be the interest of James Hamilton in his father, Robert Hamilton's estate, by virtue of the title bond alleged to have been made by James Hamilton to John B. Adams, it being conceded that Bates is the owner of the life estate or dower interest of Mrs. Adams (now Craft) in the land by virtue of the conveyance made to him by Craft and his wife heretoforet set out. On the other hand Bates disputes the claim that James Hamilton sold, or executed or delivered a title bond for his interest in his father's estate to John B. Adams and depends for title in himself upon the deed made to him by James Hamilton in 1893, and other conveyances as well as his adverse holding of the land.

One of the material issues in the case is whether James Hamilton sold and conveyed by title bond to John B. Adams his interest in his father's estate, and the dispute as to this arises out of the fact that the title bond could not be produced by the Adams children at the trial. The evidence, however, is both clear and convincing that James Hamilton did sell his interest in his father, Robert Hamilton's estate, to John B. Adams and make him a title bond therefor. Mrs. Craft, who at

the time the title bond was made was the wife of John B. Adams, gives in her deposition a very intelligent account of this transaction, saying in substance that she was married to John B. Adams in 1867 and lived for about two years after her marriage on land owned by his mother and her children, and then moved to Carr's Fork on the Robert Hamilton farm; that her father, Robert Hamilton, who died in 1862, had five children and owned a large tract of land on Carr's Fork, Spring Branch, Collins' Branch of Carr's Fork, which land was divided after his death among his children; she described the land allotted to each of the five children and says that James got Collins' Branch, including all of Rope Works Branch of Collins' Fork, and that he sold this share to her husband, John B. Adams, about 1871; that she saw the title bond written that conveyed the interest of James to her husband, Adams, in the presence of some three witnesses and saw her brother, James, and also two attesting witnesses, sign the bond; that the bond was given to her husband, John B. Adams, who died in possession of the bond in 1881, and after his death she had possession of the bond for about twelve or thirteen years when it was misplaced or lost; that John B. Adams paid Hamilton for the land at the time he purchased it and her husband at once took possession of the land and did some clearing and fencing on it the first year he bought it, and cultivated it until his death, in 1881, about ten years afterwards; that after the death of her husband she and her children continued to use and cultivate the land until the deed was made to Bates in 1890; that James Hamilton, in a few weeks after he sold his interest to John B. Adams, left the county and thereafter moved to Texas and never set up any claim to the land; that Robert Bates, at the time she sold her life interest in the land to him, lived on adjoining land and knew all about the purchase of the land by Adams from Hamilton, and saw the title bond. Other witnesses corroborate the evidence of Mrs. Craft.

Robert Bates, in his evidence, said, in answer to the question—"Under what do you claim the land in controversy? A. I claim under the Jim Hamilton deed. The deed I got from Jim Hamilton." Although it should be said that in other parts of his evidence he claimed under deed from Pigmon, Gibson and Craft, but we think there

can be no reasonable ground for dispute that the land in controversy is the James Hamilton interest in his father's estate. Bates further said in his evidence that he claimed the land under the deed he got from Craft and his wife until he learned from Jim Hamilton that their title was not good and after he got the deed from Hamilton and Hamilton told him that he had never conveyed the land by title bond, he claimed under his deed, which described the land conveyed by Hamilton as follows: "All the interest said James Hamilton has and owns in the real estate owned by his father, Robert Hamilton, including all his interest in and to said lands, lying and being in Knott county, Kentucky, on Collins' Branch and Rope Works Branch of Carr's Fork;" that at the time he purchased from Craft and his wife, he did not know anything about the title bond.

A careful reading of the record satisfies us that the decided weight of the evidence shows (a) that James Hamilton did sell his interest in his father, Robert Hamilton's, lands, to John B. Adams and make to him a title bond; (b) that this title bond described the land with sufficient accuracy to identify it; (c) that the title bond, without any fault on the part of the grantees on their successors, was lost or mislaid; (d) that Bates, long before and at the time he purchased Hamilton's interest, knew of the existence of this title bond and its contents, the fact of its execution and delivery by Hamilton to Adams, and that it covered the same land that Hamilton deeded to him. In short, every essential fact necessary to sustain the title bond and the knowledge of its existence and contents by Bates before his purchase from Hamilton, was established by the weight of the evidence.

There is, as we have said, some question made by Bates that the land conveyed to him in September, 1890, by Craft and his wife in the deed heretofore referred to, does not cover the land now in controversy, or the land that Bates subsequently bought from Hamilton, but the weight of the evidence independent of the evidence of Bates shows that the land in dispute is the land that Adams purchased under the title bond from Hamilton, and the same land that Hamilton afterwards conveyed to Bates, and this evidence is thoroughly supported by the evidence of Bates himself who, being asked

under what title he claimed the land in controversy, said he claimed it under the Hamilton deed, and furthermore that he claimed the land under the deed from Craft and his wife until Hamilton told him in effect that he had never sold his interest to Adams. It is true that Bates sets up some claim that he asserted title to this land in dispute under other deeds, but we do not attach much importance to these statements in view of the very conclusive nature of the other evidence. It thus appears that Bates and the Adamses trace their title back to the same source, James Hamilton, the Adamses claiming under the title bond made to their ancestor, and Bates claiming under the deed made to him by James Hamilton, but as the title of the Adamses was superior, and Bates had actual notice of this superior title, we put aside as of no importance in the consideration of the case the deed made to him by Hamilton.

Some point is endeavored to be made in behalf of Bates that the long delay of the Adams children in asserting title to this land is persuasive, if not convincing, evidence that they never had any title, but when it is considered that Bates purchased the life interest of Mrs. Adams in this land and in addition the remainder interest of one of the children, and under his purchase of the life interest, had the right to the use and occupancy of the land during the life of the life tenant, it becomes at once apparent that there was no reason why the Adams children, who had not conveyed their remainder interest in the land to Bates, should make any assertion of title or question Bates' right to the use and occupancy of the land, because he had the title of the life tenant as well as the interest of two of the children in the remainder, and consequently the Adams children could not claim either its use or possession.

What we have said disposes, as we think, of the claim of adverse holding asserted by Bates as well as the contention that he acquired a hostile interest to the Adams children by his alleged purchase of any outstanding titles. It is too well settled to need even citation of authority that the purchaser from a life tenant by his use or occupancy of the land or his assertion of claim to it while holding as life tenant will not have the effect of converting his amicable use and possession into an adverse holding or start the statute of limitation

that will toll the right of entry in the remainderman until the grantee of the life tenant has done much more than would be required to establish an adverse holding on the part of a person who did not occupy the relation of life tenant or the attitude of having made an amicable entry upon the land.

Under ordinary circumstances an adverse holding may be said to begin when the person in possession exercises the usual acts of ownership over the property and asserts a claim against the world to a well defined boundary; but of course a life tenant or his vendee does not occupy this favorable attitude and he can not assert title by adverse holding until he has brought home to the remaindermen by clear and convincing evidence notice of his intention to set up a title in himself as against them to the fee. Holmes v. Lane, 136 Ky. 21; and the same rule obtains where one joint tenant is in possession of land owned in common with other joint tenants except that in the case of joint tenants actual notice is not necessary. Greenhill v. Biggs, 85 Ky. 155. According to this rule there is in this case no evidence that would warrant us in holding that Bates held this land adversely to the remainderman.

The instructions are complained of, but we think they submitted fairly the law of the case to the jury, and that the jury under the law and the facts could not well have returned a verdict other than the one they did.

Wherefore, the judgment is affirmed.