## Slack's Ex'r et al. v. Barrett et al.

March 27, 1942.

252

Browning, Zeigler & Cochran for appellants.

J. M. Collins, Jr., B. S. Grannis and Harry B. Mackoy for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

The question presented on appeal involves the title to 50 shares of stock of the Bank of Maysville, of the agreed value of $5,000, and incidentally the construction of the holographic will of E. C. Slack, who died March 3, 1918, which in so far as pertinent reads:

"(b) I desire that my wife Sallie Downing Slack have the remainder of my property as long as she may live. At her death I desire what is left of my personal property, and all the real estate she gets from me to be divided equally between my sister's, Mrs. O. F. Barrett's, two children, Slack and Dorothy Barrett. I wish for my wife to be appointed administrator without surety."

Mrs. Slack qualified, and acted as executrix until her death, August 11, 1937. She also left a holographic will, dated November 26, 1936, in which she provided for payment of debts, and made some twenty-five or more specific bequests, then wrote:

"(a) I give to Elmer Downing my Bank of Maysville stock, 70 shares * * * (z) What is left after these bequests I give to Hayswood Hospital."

She named the Bank of Maysville executor, and it qualified and is still acting. As the pleadings develop, the parties in interest were the niece and nephew of Mr. Slack, and Elmer Downing, cousin of Mrs. Slack, and the Hayswood Hospital, residuary legatee under Mrs. Slack's will.

The controversy arose by the filing of a petition by the niece and nephew in which they asserted ownership under the will to 50 shares of the Bank of Maysville stock, certain articles of furniture, described as heirlooms and antiques, and several shares of stock, admittedly owned by testator at the time of his death. As to

the 50 shares of stock it was averred this item was inadvertently omitted from the inventory of Mr. Slack's personal property, and appropriated by her. The other stock, and the articles of furniture were listed, but they say that notwithstanding Mrs. Slack only had a life estate, she disposed of same by inter vivos gifts or sales. Their prayer was for judgment for the 50 shares of stock, or value if it had been disposed of; for value of the stocks mentioned in Mr. Slack's inventory, and the articles of personal property, and if not forthcoming, then their value.

The executor was named defendant, and in its answer admitted its possession of the stock in controversy. It took the position that under Mr. Slack's will the widow took the life estate, with an implied power of use and disposition, general and unlimited, since under all the facts and circumstances, there was and could be no necessity for use or disposition on her part, hence the power was absolute, in so far as personal property was concerned. In this pleading it was developed that the certificate, 70 shares of stock bequeathed to Mr. Downing, included 20 shares admittedly owned by Mrs. Slack, and about which there is no dispute. The executor then suggested that since it was willed to Mr. Downing he was the real party in interest. Mr. Downing intervened and asserted that the 70 shares of stock belonged to Mrs. Slack, and passed under her will.

It also developed that he was heir-at-law of Mrs. Downing, and if the court should be of mind that the 50 shares belonged to Mr. Slack, and passed under his will, then he was entitled to contribution to the extent of the value of the stock. Section 2077, Kentucky Statutes. This plea involved matters, and Hayswood Hospital intervened. It adopted the idea expressed in the pleading of the executor in so far as it undertook to construe the will to mean that Mrs. Slack took title to the personal property.

The intervenor Hospital also interposed the pleas of limitations and laches. Both were based on the facts that Mrs. Slack had qualified as executrix, and as such had caused an inventory to be made and recorded, which did not include the 50 shares of stock; that one of the appraisers, then president of the bank, was the officer required to sign the stock certificates issued or transferred, had not included the 50 shares of stock in the inventory.

That notwithstanding the failure of the inventory to include the stock, neither of the plaintiffs questioned the failure, filed exceptions, or took action until they began prosecution of their suit, nineteen years after the appraisement was filed, and had the remaindermen under the E. C. Slack will acted with diligence and questioned the inventory, and noted the bank records (destroyed in the 1937 Ohio river flood), the question of ownership might have been sooner determined; Mrs. Slack would have known of claim of adverse ownership, and drawn her will in another fashion, or established her title.

Presumptively they say, the executrix and the appraisers faithfully performed their duties as required by law and fully accounted for the entire personal estate of the testator. It was asserted that the unchallenged inventory constitutes a correct accounting of E. C. Slack's personal estate, and that by silence and acquiescence they have prejudiced the rights of the residuary legatee by placing it in a position where it cannot well defend itself against plaintiffs' assault. This pleading developed, as later shown, that all records relating to the 50 shares of stock, except as hereinafter noted, had been destroyed.

Mr. Downing in an amendment alleged that since the controversy arose, the stocks in question had accumulated dividends to the extent of $900, which would pass to whomsoever might be adjudged the owner, and he should have contribution to the extent of the accumulations. Plaintiffs then filed reply and answer to the answer and cross-petition of residuary legatee, taking issue with its (and the executor's) construction of the E. C. Slack will. They admitted the filing of the inventory, which was not filed until January 19, 1919, year of Mr. Slack's death, but assert that no settlement of his estate had ever been made; that they had no knowledge of the inventory having been made until a "very recent time." That it would have been against their interest to have precipitated a controversy, and that as far as the remainder interest was concerned no right of action accrued to them until the death of Mrs. Slack. All pleadings not specifically otherwise controverted, were controverted of record, and thus the issues closed. Proof by depositions was adduced and the chancellor upon submission adjudged substantially as follows:

(a) That under Mr. Slack's will his widow took all

of his property, real and personal, with the right to consume personal property, if reasonable necessity so required, and subject to such rights the remaindermen took the title to the personal property not consumed by her. That no necessity arose for consumption or use during her life, so that such of the personal property as came to her hands at the time of E. C. Slack's death, not disposed of during her lifetime, passed under the will to the niece and nephew.

(b) That E. C. Slack was at the time of his death the owner of 50 shares of the First Standard Bank and Trust Company stock, later exchanged for stock in the Bank of Maysville, "this being the stock in controversy," still in existence and subject to identification, which pass to the plaintiffs jointly, and the bank will issue to them certificates, and pay dividends on said stock, accumulated since the death of the widow, to the sum of $900.

(c) This stock was willed to Elmer Downing by Mrs. Slack, and he being her heir-at-law, and the bequest failing, he is adjudged to recover of the executor the proven value thereof, $5,000, and in addition thereto $900 in lieu of dividends accumulated.

(d) The following items mentioned in Mr. Slack's will were converted by Mrs. Slack; the Home Warehouse stock, $550; the Milling Company stock, $80; the Fair stock, $30, and several items of furniture, all, including stock above named, of the value of $1,060, which the executor was directed to account for in value.

(e) Since there are sufficient assets to pay all debts, specific bequests and costs, the executor is directed to pay the sums above specified from the residue of the estate. To this judgment the residuary legatee objected, excepted and is, in conjunction with the executor, prosecuting this appeal.

It is agreed that both Mr. and Mrs. Slack were persons of ability, intelligence, high moral character and standing; that Mrs. Slack qualified as executrix as stated, and inventory of personal property filed in January 1919 made no mention of the 50 shares of bank stock; that Mrs. Slack never made settlement, partial or otherwise, of Mr. Slack's personal estate; that no appraisement of her estate was made, or if so it is not part of the record. A partial settlement of her estate was made in 1938, after the filing of the suit by the plaintiffs.

The settlement filed notes that there came to the hands of the executor 70 shares of Maysville Bank stock. This shows distribution in kind of household goods and furniture, but does not show distribution to Mr. Downing of the bank stock. Mrs. Slack's personal estate, as per inventory, totals something over $65,000. Mr. Slack's inventory showed a personal estate of less than $1,500. The suit was filed May 3, 1938, prior to partial settlement in September of the same year.

There seems to be little question or discussion as to the chancellor's judgment which required the executor to account to plaintiffs for specific articles in kind, or their value, or stock of comparatively minor value, which were apparently disposed of in kind by Mrs. Slack. The only discussion as to antiques and heirlooms relates to value, on which question plaintiffs alone offered proof. The contest is the ownership of 50 shares of stock, and a determination of this question hinges on meager proof, due to two casualties, death of a keeper of records and the flood of January 1937, which swept away the records relating to the ownership of the 50 shares of stock.

The history of the stock appears to be as follows: Mr. Kehoe testified that he had been president of the First Standard Bank and Trust Company, which merged with the First National Bank in 1916. The First Standard and the Bank of Maysville merged in March 1919. He testified as to the loss by flood of all records and papers of the First Standard, save what is called its minute book, in which Mr. Slack's name appeared as a shareholder. He then showed from the books of the Maysville Bank the plan of issuance of stock in that bank to shareholders in the merged First Standard, apparently share for share. Mr. Slack was listed as director of First Standard in January 1917, and re-elected in January 1918. The minutes of a former meeting showed an order to sell Mr. Slack 50 shares of First Standard. On January 8, 1918, Mr. Slack was ill and the directorate passed a resolution of sympathy, and immediately following his death a resolution of sorrow and praise, referring to him as director.

Mr. Kehoe became president of the Bank of Maysville following the merger. Mr. Slack was never a director of the Bank of Maysville, though it appears that Mr. Downing was such. Witness said Mr. Slack never owned any stock in the Maysville Bank, and could not

have been elected a director "because he would have to have had stock in his name to be eligible." The Banking Commissioner of Kentucky testified from records of 1916-18 that Mr. Slack was listed as director, and a stockholder holding 50 shares of the First Standard.

Mr. Kehoe also testified that he was one of the appraisers of Mr. Slack's personal estate. He said he was well acquainted with all the stockholders of the Maysville Bank at the time of Mr. Slack's death. Asked who was the owner of the stock at the time, he said, "I do not know who was the owner." Asked "Was E. C. Slack the owner of that stock, or did it stand to his credit or in his name at the date of appraisement?" A divisible question to which he answered, "No, it was not in his name at the time of the appraisement, had it been we would have appraised it." He further said that he did not know of its having been transferred to some other person, "so that it did not stand in his name when the appraisement was made." If there had been transfer he would have known who was the owner, but not date of transfer since the records were kept by other officers.

The only written document relating to what is admitted to be the stock in question (save the minute book referred to above) is the stock ledger sheet of the Bank of Maysville which shows some stock transactions on the part of Mrs. Slack. This was introduced by Mr. Daly an employe of the Maysville Bank, who testified (by affidavit) as to the destruction of Standard's books and papers, and as to the death in 1920 of Mr. Threlkeld, who made the entries on "Sheet No. 3, Mrs. Sallie Downing Slack." This sheet shows that on April 2, 1919, there was transferred from First Standard Bank and Trust Company to Mrs. Slack certificate No. 190 for 50 shares, and on July 10, 1920, from J. M. Kehoe, certificate No. 274, 25 shares. On February 2, 1922, certificate No. 274 was cancelled and certificate for 5 shares issued to D. K. Rogers, and one for 20 shares to Mrs. Slack; this accounts for the 70 shares mentioned in Mrs. Slack's will. On January 2, 1935, certificate No. 190 was cancelled and reissued (Cert. 753) for 70 shares to Mrs. Slack, and on November 17, 1938, there were two certificates issued, one for 20 shares to Mr. Downing; another for 50 shares to the Bank of Maysville, Ex'r.

The cousin, legatee under Mrs. Slack's will, testified that in October 1917, at the request of Mr. Slack, he un-

dertook to settle some partnership business, chiefly the making of certain conveyances of real estate. It seems that the husband and wife owned property jointly. They deeded to Mr. Downing the Wood and Worthington tracts, and he in turn conveyed one tract to the wife; the other to the husband. He says "there were other properties discussed in the settlement." Mr. Slack was to turn over to the wife the 50 shares of First Standard stock. He was not positive that there had been any "transfer of the bank stock."

On the other hand Mr. Barrett, remainderman under Mr. Slack's will, testified that a short while before his death he went to his uncle's home, and after some apologetic remarks as to conditions of the home place, he said he doubted if it would be in any better condition "when it comes to you and your sister," and said: "You and your sister will have my bank stock; I guess that will make it about right." Vigorous exceptions were noted by contending parties to the testimony of the nephew and cousin, which upon consideration the chancellor sustained with the notation: "Said testimony is not to be considered." We express the opinion that the chancellor by reason of the provisions of Section 606 of the Civil Code correctly held that such testimony was wholly incompetent, and the arguments of contending counsel that the one or the other, according to views expressed in briefs, was competent, are not persuasive.

Appellants' first contention is manifested in pleadings to the effect that under the will of Mr. Slack, the widow took title to the personal property, followed by the pleas of limitation and laches; that is, having knowledge of the existence of the stock they were charged with notice of the requirement of the law that inventory must be made, and that such inventory was prima facie evidence for and against the representative (Section 3855, Kentucky Statutes), and as persons of more than ordinary prudence they were put upon inquiry, and should have taken steps to correct the inventory. Just how or in what form and when such action was to be taken is not pointed out; there appears neither statute nor pronouncement of court giving a probate court the power to determine title to property.

In some jurisdictions it has been held that a probate court has the power to determine title to property as between a decedent's estate and the personal representa-

tive, mainly in settlement. Security First Nat. Bank Los Angeles v. King, 46 Wyo. 59, 23 P. (2d) 851, 90 A. L. R. 125. It is apparent that Mrs. Slack, up until her death, laboring under the impression that she held title to the personal property, never undertook to make settlement, partial or otherwise. On the other hand the legatees, including the residuary, realizing that under Mr. Slack's will the widow taking a life estate, were in no position to enforce settlement.

The rights and interests of legatees or beneficiaries cannot well be determined until settlement be tendered, and it seems that the plea of laches or limitation would begin to apply only upon settlement, and it would logically follow that a remainderman, where it appears, as here, that the executor is the life tenant, is not barred from asserting rights to property not included in inventory.

Shutt's Adm'r v. Shutt's Adm'r, 192 Ky. 98, 232 S. W. 405, 409, is applicable, since it appears that the widow converted bank stock to her own use, or held it in her possession for many years. We shall not give details, but there was presented a question of right of the appellant to maintain the suit. In the opinion we cited a number of cases which indicated that a remainderman might proceed in equity prior to the expiration of the life estate to quiet title, or place themselves in position to have property forthcoming when the time arrives for possession. We said:

"These cases, however, also hold [respecting the recovery of possession of the property] that the statutes of limitations do not begin to run against remaindermen until the expiration of the life estate; which is necessarily so, because the possession of a life tenant, or of one holding under the latter, cannot, during the continuance of the life estate, be adverse to the remainderman."

We held that the life tenant's holding not being adverse to the remaindermen, the statute did not begin to run, notwithstanding the life tenant failed to charge herself with it in various settlements. On principle this case is approved in Fish v. Fish, 184 Ky. 700, 212 S. W. 586; Carpenter v. Moorelock, 151 Ky. 506, 152 S. W. 575.

There can be no adverse holding unless the life tenant brings home to the remainderman, during life of the tenant by clear and convincing evidence, notice of inten-

tion to claim the fee. Bates v. Adams, 182 Ky. 100, 206 S. W. (2d) 163; Russell v. Tipton, 193 Ky. 305, 235 S. W. 763. In Hall's Adm'r v. Hall's Ex'r, 265 Ky. 528, 97 S. W. (2d) 23, we held that a remainderman takes title to personal property from a testator through the executor, and that a suit to surcharge a settlement arises when the settlement is made. Here, as we have indicated that the legatee under Mr. Slack's will had the right to the use of personal property during her life, there is not presented a situation where there was a fixed or determinable remainder, and in this respect it is distinguishable from Yaeger v. Bank of Kentucky, 127 Ky. 751, 106 S. W. 806, 16 Ann. Cas. 537, and Coffey v. Wilkerson, 1 Metc. 101, cited by appellants, as may be Schott v. Schott's Executor, 286 Ky. 208, 149 S. W. (2d) 782, where there was a direction in the will for the sale of property within a fixed period, and for distribution to remaindermen.

We fail to see where the appellees failed to perform any duty required of them by law, or equitable principles, which would sustain the plea of laches. Assuming notice or knowledge, they were guilty of no conduct which would serve to mislead the residuary legatee. They acted when they conceived they had the legal right to act; promptly following the death of the life tenant, and they had the right to assume that the widow had the use of the personal property as long as she might live. They were hardly chargeable with the knowledge or belief that the time might come when she would be compelled to take advantage of her right.

Without carrying this discussion further, we fail to see where any omission on the part of appellants, any undue or unaccountable delay, was calculated to work an injury or disadvantage to complaining parties. To uphold the contention would be, under the facts presented, to charge that appellees should have foreseen that the death of a bookkeeper, or the destruction of records by a great flood would place parties in a position where they would be unable to sustain the position they now take, and here, since there is much speculation in the case, it might be as well assumed that available proof would have worked otherwise.

The foregoing leaves for consideration only the question and effect of proof. So far we have attempted to recite such proof as was adduced, without except in-

cidentally making comments thereon, and we do not feel inclined to lengthen this opinion by giving a resume of the conclusions reached, as evidenced in briefs, or to what are termed corroborative circumstances, which it is claimed would tend to fortify the position of able counsel. For example, the insistence of appellant that the only record introduced showed transfer of the 50 shares of stock without restriction; the participation of the bank officers in the transaction; recurring transfers; Mr. Slack's ill health may have inspired a transfer by indorsement; death may or could have delayed transfer of record; the disposition of "my bank stock" by Mrs. Slack in her will, and others of like import, all of which acts it is insisted were performed in the best of faith, an assertion which we would have no reason to doubt, and may well assume that the chancellor was of the same mind.

It is seldom that a case is presented to us which so forcefully calls for the application of a rule long established and strictly adhered to by this court; a rule recently stated in Mullins v. Staton, 287 Ky. 296, 152 S. W. (2d) 939, 941, wherein we said:

> "At the most we can only say that the record is such as to leave in our minds a doubt as to the correctness of the chancellor's finding and, this being true, it is our duty to sustain it."

We could not say here that the conclusion of the chancellor was manifestly against the weight of the evidence: McIntosh v. Turner, 239 Ky. 495, 39 S. W. (2d) 966. See also Kentucky Digest, Appeal and Error, Key Number System 1009 (3, 4). It follows that the judgment of the lower court must be, and it is, affirmed.